**UNITED STATES of America**

v.

**Arthur Carey PRYOR, a/k/a Camden Peller, Defendant.**

**Crim. No. 86–00058–B.**

United States District Court, D. Maine.

Feb. 3, 1987.

Timothy Woodcock, Asst. U.S. Atty., Bangor, Me., for plaintiff.

Lewis Vafiades and Jeffrey Hjelm, Bangor, Me., for defendant.

## MEMORANDUM AND ORDER

CYR, Chief Judge.

Defendant is charged with armed robbery of the Blue Hill branch of the Bar Harbor Banking and Trust Company [the Bank], in violation of 18 U.S.C. § 2113(a) & (d). Defendant moves to suppress items seized in the course of a search of the room he rented in Castine, Maine, and items seized from a safe deposit box and hotel room in Cambridge, Massachusetts. After three days of hearings and further briefing by the parties, the court makes the following findings of fact and conclusions of law. *See* Fed.R.Crim.P. 12(e).

## FACTS

On Friday, July 11, 1986, the Blue Hill branch of the Bar Harbor Banking and Trust Company was robbed. At about 2:30 p.m. on July 11, Patricia Curtis, manager of the Bank, entered her office where a man pointed a gun at her and told her: "There's going to be a robbery." Ms. Curtis did as the armed man instructed by asking two tellers to come into her office while Ms. Curtis went to the bank vault to remove money. Ms. Curtis returned with the bank bags filled with currency in denominations from $20 to $100. The armed man took the two bank bags and placed them inside a brown leather overnight bag. After warning the manager and tellers not to call anyone for 20 minutes, because he had people watching the bank and did not want anyone to get hurt, the armed man walked out of the bank with the money.

Witnesses described the armed man as a white male, about six feet tall and weighing approximately 200 pounds, clean shaven, with pale skin and a soft voice, and in his late twenties or early thirties. He was wearing blue jeans and dirty white sneakers or deck shoes, and he had what was described as an old bedspread, blanket or sheet draped over his shoulders poncho-style. The bedspread is described, variously, as being light in color, purple or lavender, with a white swirl design running through it. On his head he wore a yellow or gold scarf which obscured his hair, and a large floppy straw hat. He wore a necklace with large gray beads, about the size of mothballs. In addition, the robber had red lipstick on his lips and white paste makeup on his face. Throughout the robbery he wore sunglasses with pink frames. Witnesses noted that his hands were smooth and his nails were bitten "to the quick."

The Federal Bureau of Investigation [FBI] and the Hancock County Sheriff's Department conducted a joint investigation of the robbery. On Tuesday, July 15, 1986, an informant told investigators that on the previous Friday, the day of the robbery, at 1:30 or 2:00 in the afternoon on two occasions she had seen an individual wearing a poncho, sunglasses and a straw hat driving

a light blue station wagon in the village of Blue Hill. Also on July 15, Sheriff Clark of the Hancock County Sheriff's Department interviewed Nancy Carr. Ms. Carr is the owner of Dice's Head Lighthouse, which is located in nearby Castine. Ms. Carr told investigators that she had been renting a room in the Lighthouse to one Camden Peller since September 1985. Ms. Carr described Peller as being 32 years old, about six feet one inch tall, and weighing about 200 pounds. Ms. Carr stated that Peller had had a mustache, but that, when she saw him last on July 12, she did not remember seeing the mustache. Ms. Carr stated that Peller was "immaculate," that he wore white sneakers, and that he bit his fingernails. Ms. Carr recalled that when Peller moved into the Lighthouse he had with him a lavender "chenille" bedspread which was old and worn. Ms. Carr had seen the bedspread at different places in the Lighthouse and in Peller's car, which she described as a blue Chevrolet station wagon.

A portion of the interview with Ms. Carr was conducted at the Lighthouse. Ms. Carr explained that the Lighthouse is her home, that Peller had the exclusive use of one room at the Lighthouse, and that Peller shared common areas of the house, such as the living room and kitchen, with her, her son, and another individual who rented a room at the Lighthouse. While conducting the interview at the Lighthouse, Sheriff Clark observed a floppy straw hat hanging in the entryway to the kitchen. Ms. Carr stated that the hat usually was hung in that spot. Sheriff Clark then repeated the description of the necklace worn by the robber, and Ms. Carr obtained from her room a necklace matching that description. Ms. Carr stated that Peller had access to the room in which the necklace was kept.

Ms. Carr had last seen Peller on Saturday, July 12. Peller told her that he had hired a limousine to take him to Boston to do some shopping. Peller told Ms. Carr that a local service station was going to pick up his car for a complete overhaul, and left Ms. Carr $2,000 in $20 bills for her to

cover expenses. Peller also left $420 for the rental of his room through September.

Following the interview, Sheriff Clark and Ms. Carr searched the Lighthouse, excluding defendant's room, for the lavender bedspread. An investigator from the Sheriff's Department located defendant's automobile at the service station, and looked through the car windows but did not see the bedspread.

Subsequently, FBI Special Agent James Sangillo applied to the United States Magistrate for a warrant to search defendant's room at the Lighthouse for the bedspread. In addition to stating the foregoing facts,[1] the affidavit submitted by Agent Sangillo requested permission to execute the search at night:

> Your affiant requests authority to execute this warrant at any time day or night on the grounds that the bedroom of Camden Peller is known to be unoccupied at present and that your affiant wishes to execute this warrant before Peller returns to minimize risk to law enforcement officers and others.

Search Warrant on Written Affidavit, Government Exhibit No. 1, Attached Affidavit ¶ 33 [hereinafter cited as Maine affidavit].

The Magistrate issued the warrant at 9:21 p.m. on July 15, 1986, and authorized a search of defendant's room at any time, night or day, prior to July 22, 1986. The search warrant described the item sought as "a lavender chenille bedspread usable as a poncho which is evidence of a crime of bank robbery...."

The warrant was executed at approximately 11:00 p.m. on July 15 by Agent Sangillo and five members of the Hancock County Sheriff's Department. The search party found the door to defendant's room secured with one or two padlocks, which Sheriff Clark cut with bolt cutters. Prior to the search, several photographs were taken of Peller's room. Agent Sangillo testified that there was no standard procedure with regard to photographing the

---

1. The foregoing facts are found after consideration of all the evidence. The court discusses defendant's specific challenge to the sufficiency

of the facts presented to the Magistrate and allegations of omitted facts in greater detail below.

scene of a search, but that, in this case, because the occupant of the room was not present Sangillo wanted to photograph the scene as it appeared prior to any search. Sangillo also instructed Sheriff Clark to photograph all evidence *where it was found.*

The defendant's exclusive living quarters at the Lighthouse consisted of one room located on the first floor. The room is rectangular, measuring 17 feet by 11 feet. There is only one entrance to the room. The entry door is located in a corner of the room and on its longest wall. Upon entering the room, there is a closet immediately to the left.

Most of the searching of the apartment was conducted by Chief Deputy Sheriff Dickson. After entering, turning on room lights and taking pictures, the officers scanned the room to see if the bedspread was readily apparent. As it was not, Deputy Dickson began a more methodical search, starting with the closet to the left of the entry door and going clockwise around the room. As the search of the closet is critical to defendant's motion to suppress, the court describes the closet in some detail.

The closet has a full-size door, which was closed but not locked. The closet is 45 inches wide, 21 inches deep and 108 inches high. The closet doorway is 27 inches wide, 80 inches high and is set slightly to the left [2] of the center of the closet. Thus, the closet itself extends 15 inches further right than the right edge of the closet door.

The closet shelf is set 76 inches above the closet floor and runs the full 45–inch width of the closet. The shelf is 11 inches deep and its back edge is contiguous with the back wall of the closet. A horizontal pipe, intended for use as a hanger bar, is located 76 inches above the closet floor and immediately in front of the front edge of the shelf. The distance from the back wall of the closet to the front of the hanger bar is 12¼ inches.

Five pipes run vertically through the closet. On the right side are two galva-

nized metal heating pipes, approximately 6 inches in diameter. The pipe nearest the back wall of the closet [hereinafter referred to as the back pipe] runs from the floor of the closet, through a hole in the shelf, to the closet ceiling. Measuring from the top side of the closet shelf, and from those parts of the back pipe which encroach most closely, the back pipe is 5½ inches from the right closet wall and 1¾ inches from the back closet wall. The back pipe does not run parallel to the closet walls, but angles away from the right closet wall as it ascends. At ceiling level, the back pipe is 9 inches from the right wall and 2½ inches from the back wall.

The second galvanized pipe on the right side of the closet [hereinafter referred to as the front pipe] does not pass through the closet shelf, but runs from the floor to the ceiling in front of the hanger bar. This front pipe is 2¾ inches from the hanger bar, 7 inches from the right closet wall, and 1 inch from the front wall of the closet. The other pipes, a drain pipe and hot and cold water pipes, are located on the left side of the closet, and need not be described further for the purposes of the present motion.

Deputy Dickson is approximately 6 feet 5 inches (77″) tall with shoes; his *eye* level, therefore, is three or four inches below the level of the closet shelf. While standing on the closet floor and looking up toward the back of the closet, Dickson at most could see the back closet wall beginning at a level 3 or 4 inches above the shelf. Although there were chairs in the room, Dickson testified that he did not intend to use any of the chairs for fear of breaking them.

First, Dickson opened the closet door. Using available room light and a flashlight and assisted by Detective Leper, Dickson began the search for the bedspread. Starting with the top right portion of the closet above the shelf, he saw numerous objects on the shelf. Dickson first removed two candlestick holders so that he could search the part of the shelf behind the candlestick

**2.** "Left" and "right" are used from the perspec- tive of a person facing into the closet.

holders without breaking them. After removing the candlestick holders, Dickson observed a green terry cloth towel wedged between the right closet wall and the back pipe. Dickson reached up and touched the towel, and then removed it from the closet with both hands, stating "I know what this is." Dickson opened the towel, which contained several bundles of money, and handed it to Agent Sangillo.

Continuing his top-to-bottom search, Dickson reached the floor of the closet without finding the bedspread. On the floor of the right side of the closet he saw a clothes basket and several items of clothing. Dickson removed the clothes basket in order to search it in room light and to obtain a clearer view of the closet floor. While removing the clothes basket Dickson saw pieces of a rifle which were leaning in the direction of the right front corner of the closet and were partially concealed by the front pipe. Dickson reached into the space between the right closet wall and the front pipe and removed two objects: what appeared to be a portion of the stock of a rifle and what appeared to be part of a rifle barrel.

Deputy Dickson did not find the bedspread in the closet, so he continued his clockwise search of the room, assisted by Detective Leper. While searching a wicker basket containing newspapers, Leper seized a newspaper article describing a bank robbery. Leper also seized a bottle of "Collagen Elastin Lotion" which he saw on top of a dresser. Leper and Dickson lifted the mattress of the only bed in the room and Leper seized a wallet found between the mattress and a piece of plywood. The bedspread was not found.

While the search continued, Agent Sangillo counted the money and checked the serial numbers against a list of "bait money" serial numbers supplied by the bank.[3] The total amount of the currency found in the green towel was $11,890, including five $20 bills which had serial numbers that matched the "bait money" serial numbers.

Based on the information contained in the Maine affidavit, as well as the discovery of the "bait money" and rifle parts in defendant's room at the Lighthouse, on July 16, 1986 a warrant was issued for defendant's arrest. Previously, Ms. Carr had told investigators that defendant was staying at the Hyatt Regency Hotel in Cambridge, Massachusetts. After the arrest warrant issued, FBI agents ascertained that an individual had registered under the name of Dr. Camden Peller and had reserved room 1032 at the Hyatt Regency until July 18, 1986. Shortly after noon on July 16, defendant was arrested in a walkway over the atrium of the Hyatt Regency. When asked if he was Camden Peller, defendant replied that he was "Dr. Camden Peller." At the time of his arrest, defendant was carrying the key to room 1032, a wallet containing cash and a driver's license in the name of Arthur Cary Pryor, and a small metal key with the number 31 imprinted on it.

After defendant's arrest, Agent Sangillo applied for a warrant to search room 1032 and the hotel safe deposit box registered in the name of Dr. Camden Peller. The affidavit submitted in support of the warrant incorporated the Maine affidavit and the Arrest affidavit, and set forth additional facts concerning the stolen money, the defendant's arrest earlier that day, and defendant's stay at the Hyatt Regency. At 6:20 p.m. on July 16, 1986, a United States Magistrate in Boston issued a warrant to search safe deposit box 31 and room 1032 for ten items.[4]

---

3. The Bank kept a list of certain serial numbers: The Bank's list of serial numbers identified "bait bills" whose serial numbers had been recorded at some time before the robbery as a general precaution against such an event. The purpose of creating a list of such bills is to permit the tracing of the bills in the event of a robbery or other loss of the monies. Arrest Affidavit, ¶ 3.

4. The Cambridge warrant authorized a search for the following items:
   1. colored bank currency wrappers, including some with the initials "S.G.";
   2. sawed-off, foreshortened rifle;
   3. handgun;
   4. twenty and hundred dollar bills;
   5. lavender or purple chenille bedspread or sheet;
   6. gold-colored bandana scarf;

FBI Special Agent Larry Nivison searched the safe deposit box. Using the key found on defendant at the time of his arrest, Nivison opened the box and found 74 packets of currency, each containing 25 $20 bills, one packet containing 20 $20 bills, and several red paper bands of the type used to wrap packets of money. The currency was seized.

FBI Special Agent Alan Jackson conducted the search of room 1032. After assisting in the arrest of defendant, Jackson secured room 1032 until a warrant could be obtained, first by waiting outside the room, then by waiting in the room next to 1032. At approximately 6:30 p.m. on the 16th, Agent Nivison contacted Jackson by radio and told him that a search warrant had issued. Nivison did not read the warrant, but advised Jackson of certain items to look for, such as money, money bands, a handgun, and makeup. After informing hotel security that a warrant was en route, Jackson was admitted to room 1032. Upon entering, Jackson saw several pieces of luggage. Jackson conducted a cursory search of each piece of luggage, and after noting the large number of individual items contained in the luggage he concluded that it would be necessary to inventory all of the luggage and contents. The four bags of luggage were brought to the FBI office, and an inventory of 186 items was compiled over the next two days.

## DISCUSSION

Defendant contends that the Maine and Cambridge searches were illegal and that their fruits must be suppressed.

### A. *The Maine Affidavit*

Defendant asserts that the affidavit executed by Special Agent Sangillo does not establish the requisite probable cause. Defendant mounts a piecemeal attack on the affidavit, asserting that various facts, such as physical similarities between the robber and the defendant, defendant's access to clothing and jewelry similar to that worn by the robber, and similarities between defendant's vehicle and a vehicle driven by an individual dressed like the robber, are insufficient to establish probable cause. Defendant also notes that the affidavit contains no evidence of any witnesses' trustworthiness or reliability. Finally, defendant argues that

> The data set forth in Special Agent Sangillo's affidavit falls (sic) short of establishing a probability that this Defendant's bedroom would be the repository of the particular blanket claimed to have been used by the perpetrator. For this reason, the considerations invoked by the United States Supreme Court in *United States v. Leon*, 468 U.S. 897 [915, 104 S.Ct. 3405, 3417] 82 L.Ed.2d 677, 694 (1984), to allow the introduction of otherwise illegally secured evidence, are not applicable.

■ A Magistrate's determination of probable cause is entitled to great deference on review. *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983); *United States v. Ventresca*, 380 U.S. 102, 108–09, 85 S.Ct. 741, 745–46, 13 L.Ed.2d 684 (1965). As the Court stated in *Gates*, probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." 462 U.S. at 232, 103 S.Ct. at 2329. Probable cause exists when, considering all of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332.

■ The Maine affidavit is more than sufficient to establish "a fair probability" that the bedspread, evidence of the crime of bank robbery, would be found in defendant's room. The affidavit establishes (1) that defendant and the robber had similar physical characteristics, right down to their bitten fingernails; (2) that defendant

---

7. pink-rimmed sunglasses;
8. cloth bank currency bags;
9. brown leather over-nite bag with a hand carrying strap and zipper;

10. written materials pertaining to Yacht Design Institute.
Government Exhibit 3.

owned a vehicle similar to a vehicle driven by the robber; (3) that one day after the robbery defendant was dispensing large amounts of cash in the same denominations as the cash stolen from the Bank; (4) that defendant had a bedspread similar to that worn by the robber as a poncho and that the bedspread had been seen at the Lighthouse on several occasions by the landlady; (5) that defendant had a leather overnight bag similar to the overnight bag used by the robber; (6) with regard to pants and footwear, that the defendant and the robber dressed similarly; and (7) that defendant had access to a hat and necklace similar to those worn by the robber. Considered together, these facts established a fair probability that defendant was the Bank robber.

These facts also gave rise to a fair probability that the bedspread would be found in the Lighthouse room rented by defendant, particularly in light of Ms. Carr's statements that she had seen the bedspread in various places in the Lighthouse while defendant resided there, and the fact that the bedspread was not found either in the common areas of the house or in open view in defendant's vehicle. Defendant's general attack on the sufficiency of the affidavit must fail.[5]

### B. *Omissions From The Maine Affidavit*

Defendant contends that the Maine warrant is tainted because material information was omitted from the Maine affidavit. Defendant asserts that Ms. Carr told investigators that she believed defendant to be wealthy, that defendant always paid his rent in cash, and that he owned valuable antiques. Another witness told investigators that defendant frequently carried large amounts of cash, and that he paid off

a large bar bill, sometimes up to $1,000, each week in cash. In discussing defendant with investigators, Ms. Carr characterized him as a "hellava nice guy." Defendant contends that the omission of this information from the Maine affidavit was at best reckless. Defendant also argues that the failure of Sheriff Clark to inquire of Ms. Carr as to the size of the bedspread for which investigators were searching was reckless. Defendant asserts that the omissions are related to issues critical to the probable cause determination made by the Magistrate, and opines that "[w]hen the tainted data are excised from the affidavit, the remaining portions of the Government's affidavit are insufficient to support the requisite determination of probable cause." Supplemental Memorandum In Support Of Defendant's Motion To Suppress, at 19.

In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court prescribed the procedure for challenging the sufficiency of a search warrant affidavit. *Franks* involved a charge that false statements were deliberately included in the affidavit. Since *Franks*, however, courts have applied a similar analysis when there is a charge that information known to the police was omitted from the affidavit. *See United States v. Cole*, 807 F.2d 262 (1st Cir.1986) [omission of information from wiretap application]; *see generally* 2 W. LaFave, *Search and Seizure* § 4.4 at 23–24 & n. 39.1 (West Supp.1986) [citing cases].

■ Omission of information from a warrant application will result in suppression only if *material* information was omitted, either intentionally or with reckless disregard for the truth. *See United States*

**5.** Similarly, there is no merit to defendant's contention that the warrant lacks evidence of the veracity and reliability of the witnesses. The reliability of the hearsay derives from the fact that the witnesses were reporting facts of which they asserted first-hand knowledge. As to veracity, it is well established that witnesses and victims are presumptively credible. 1 LaFave, *Search and Seizure*, § 3.4 at 591 (1978); *see also United States v. Campbell,* 732 F.2d 1017, 1019 (1st Cir.1984).

In any event, even if the court were to find that the warrant was not supported by probable cause, suppression would not be appropriate under *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The affidavit is not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 3422 (quoting *Brown v. Illinois,* 422 U.S. 590, 610–11, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975)).

*v. Williams,* 737 F.2d 594, 604 & n. 6 (7th Cir.1984); *United States v. Melvin,* 596 F.2d 492, 499–500 (1st Cir.1979).

█ Defendant has not established that any material information was omitted either intentionally or with reckless disregard for the truth. The omitted information on which defendant relies came from two witnesses, both of whom were interviewed at length and discussed defendant in some detail. The omitted information amounts to two or three comments out of many comments made to officers in the course of a rapidly developing investigation. As discussed below, the comments at best are of marginal significance. In these circumstances and in the absence of any indication of intentional or reckless disregard, the failure of investigators to include in the Maine affidavit the evidence noted by defendant was at worst negligent. *Cf. People v. Kurland,* 28 Cal.3d 376, 168 Cal.Rptr. 667, 618 P.2d 213 (1980), *cert. denied,* 451 U.S. 987, 101 S.Ct. 2321, 68 L.Ed.2d 844 (1981) [deliberate decision to omit information nevertheless may be negligent if based on an unreasonable belief as to immateriality of omitted information].

Moreover, assuming *arguendo* that the information was omitted intentionally or with reckless disregard for its truth, it cannot be said that it was material. Omitted information is material only if, when the affidavit is considered together with the omitted information, the court finds that probable cause for the warrant would be lacking.[6] *See United States v. Cole,* at 267–268 [citing with approval the district court's definition of "material"]; *see generally* 2 W.R. LaFave, *Search and Seizure* § 4.4, at 24 n. 39.1 (West Supp.1986) [citing cases discussing "material" omissions]. Thus, the court considers whether the Maine affidavit, together with the omitted information, provides probable cause for the warrant to search defendant's room.

As noted above, defendant contends that the following omissions are material: (1) statements by Ms. Carr to the effect that "[d]efendant was a wealthy man. He made several cash gifts or loans to other people on several occasions. He habitually paid his rent in cash, and he owned valuable antiques," Defendant's Supplemental Memorandum, at 16; (2) Ms. Carr's characterization of defendant as a "hellava nice guy," *id.* at 17; and (3) the statements of Mr. McHugh, who also rented a room at the Lighthouse, that defendant always carried a lot of money with him, that defendant had a "tab" at a local bar which sometimes reached $1,000, but which was paid off regularly, and that defendant bought antiques and paintings on a regular basis.[7] *Id.* All of these statements, with the exception of Ms. Carr's characterization of defendant, pertain to defendant's "wealth."

Defendant contends that the omission of this information as to his "wealth" was misleading:

> Without [the omitted information] the Magistrate was encouraged to draw the conclusion that the cash mentioned in the affidavit was necessarily newly found. However, had the Government fully set

---

**6.** Thus, defendant's suggestion that the court must excise from the affidavit that evidence which is affected by the omissions, and then determine whether the warrant nevertheless would have issued, does not state the proper standard of review. Rather, the test is whether, after *all* the evidence is considered, the warrant would have issued. *See Cole,* at 267–268; *cf. Franks,* 438 U.S. at 171–72, 98 S.Ct. at 2684 [where there is an allegation of false information, false portions of affidavit must be excised].

**7.** In addition to the alleged omissions noted in the text, defendant contends that information as to the length of defendant's stay in Boston was omitted, and that Sheriff Clark failed to inquire as to the size of the bedspread. Neither of these "omissions" goes to the issue of probable cause for the search. The omission of information regarding defendant's travel plans bears only on whether a nighttime search was appropriate, and is considered in detail below. The failure of Sheriff Clark to inquire of Ms. Carr as to the size of the bedspread is not an omission at all, but implicitly is a challenge to the particularity of the description of the item to be seized. In view of the otherwise complete description of the bedspread, and the absence of any evidence that any person had anything more than an estimate of the size of the bedspread, the court finds that any "failure" of Sheriff Clark to inquire as to the bedspread's size is inconsequential.

forth the information available to it, as described above, such a conclusion would have been unwarranted. Defendant's Supplemental Memorandum, at 17.

The argument fails for several reasons. First, there is nothing *in the affidavit* to suggest that defendant was either rich *or* poor, and thus there is no basis in the affidavit for concluding that the money referred to was "newly found." Second, even if the omitted information had been included in the affidavit, the fact that the day after the robbery the defendant was in possession of a large quantity of cash in the same denominations as the currency stolen from the Bank would have *supported* the probable cause determination, since it is one more piece of evidence linking defendant to the robbery. Third, and most significant, is the fact that the omitted information bears on but one portion of the total probable cause showing presented to the Magistrate. In addition to the defendant's possession of money, several other pieces of evidence linking the identity of the defendant with that of the robber were presented to the Magistrate, including markedly similar physical descriptions, a description of a car whose driver's description matched that of the robber, which car's description matched that of defendant's car, and the presence, in the house where defendant lived, of two distinct items (the hat and necklace) which matched items worn by the robber. Considered in the context of all the information which was presented to the Magistrate, the omitted information certainly would not have prevented a finding of probable cause.

Similarly, the inclusion or omission of Ms. Carr's statement that defendant is "a hellava nice guy" has no bearing on the question of whether there was probable cause for the search. Ms. Carr's subjective opinion as to defendant's character has little or no relevance to the factual question of whether there was probable cause to believe that the bedspread was evidence of a crime and would be found in the area to be searched. Even if the omitted information had been included in the affidavit, there nevertheless would have been ample

evidence to support the Magistrate's determination that probable cause existed for the search of defendant's rented room. Thus the omissions were not material. *See Cole*, at 267–268.

### C. *The Nighttime Search*

The July 15, 1986 search of defendant's room at the Lighthouse was conducted after 11:00 p.m. Defendant contends that the Maine affidavit did not contain information sufficient to justify a nighttime search, that information showing the absence of the need for a nighttime search was not submitted to the Magistrate, and that the evidence obtained pursuant to the nighttime search must be suppressed.

Federal Rule of Criminal Procedure 41(c) provides, in part, that search warrants "shall be served in the daytime, unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime." *Id.* The Federal Rules define "daytime" as "the hours from 6:00 a.m. to 10:00 p.m. according to local time." Fed.R.Crim.P. 41(h).

In the Maine affidavit accompanying the application for a warrant, Agent Sangillo requested permission for a nighttime search:

> Your affiant requests authority to execute this warrant at any time day or night on the grounds that the bedroom of Camden Peller is known to be unoccupied at present and that your affiant wishes to execute this warrant before Peller returns to minimize risk to law enforcement officers and others.

Maine affidavit, ¶ 33. The search warrant states, *inter alia*, "that there is reasonable cause to authorize a search at any time of the night or day as is shown in the supporting affidavit of James Sangillo at paragraph 33." Government Exhibit 1.

Defendant contends that the information contained in paragraph 33 is insufficient to show reasonable cause for a nighttime search, particularly because statements made by Ms. Carr and Mr. McHugh suggested that defendant was to be away from

his residence until July 22. Had this information been presented to the Magistrate, defendant argues, the Magistrate "could only have determined that a nighttime search was *not* appropriate because there was no suggestion that the Defendant's return to his apartment was imminent." Defendant's Supplemental Memorandum, at 14 (emphasis in original).

■ There is no precedent establishing a framework for analyzing defendant's contention that the Government omitted information critical to the determination of "reasonable cause" for a night search. However, the situation is analogous to that in which it is asserted that the Government omitted information critical to the determination of probable cause, *see Cole, supra.* Under such an analysis, which the court considers the most stringent that could be considered appropriate, rule 41(c) is violated only if, either intentionally or with reckless disregard for the truth, information material to the determination of reasonable cause for a nighttime search is omitted from the warrant application. *Cf. Williams*, 737 F.2d at 604 n. 6; *Melvin*, 596 F.2d at 499–500; *Cole*, at 267–268.

■ There is no evidence in this case that officers omitted information from the warrant application either intentionally or with reckless disregard for the truth. Agent Sangillo's testimony indicates that he was genuinely uncertain as to when defendant might return from Boston.[8] There is no indication that Sheriff Clark, who knew at least of Ms. Carr's statements, deliberately withheld such evidence from Agent Sangillo in order to facilitate the obtaining of a nighttime search warrant. Rather, the evidence suggests that, in this rapidly developing investigation, officers confronted with a wide array of information from a multitude of sources overlooked two statements which subsequently appear relevant. Absent any contrary evidence, the court credits the testimony of the investigating officers and finds that the omission of that information was neither in willful disregard of the truth nor intentional.

Even assuming that the information was omitted either intentionally or in willful disregard of the truth, the information cited by defendant is not *material.* Borrowing the *Cole* analysis for determining probable cause for a warrant, the omitted information is to be considered material only if, had it been included in the warrant affidavit, the Magistrate could not have found "reasonable cause" for the nighttime search.

The statements by Ms. Carr and Mr. McHugh that defendant planned to be out of town for ten days were certainly relevant to the authorization of the nighttime search, but such statements would not have been dispositive had they been included. The Magistrate was confronted with strong circumstantial evidence that defendant had committed an armed bank robbery. Defendant had the resources to travel freely, making his return a possibility, notwithstanding his intentions as stated to McHugh and Carr. Moreover, there is some reason to give less than complete credence to a criminal suspect's statements as to his future plans.

In addition to genuine risks to the safety of the officers and the residents of the Lighthouse posed by a daytime search, it is reasonable to take into account the minimal nature of the intrusion into defendant's

---

**8.** Agent Sangillo testified that he had been told that defendant would be out of town for ten days, but he could not recall whether he had received this information before or after he completed the affidavit. Paragraph 27 of the Maine affidavit states, in part, that defendant left a note with Ms. Carr that stated:

In case I shouldn't return until September, I am enclosing $2,000 for payment toward my car at Allan's Garage. It will not be that much but you just never know. Take care. Camden.

In response to questioning by the court, Agent Sangillo testified that he interpreted the note contained in paragraph 27 to mean that defendant *might* return at any time, from July 12 to September.

The court credits Agent Sangillo's testimony and further finds that there was no intent to mislead the Magistrate by omitting information. If Agent Sangillo had intended to mislead the Magistrate regarding when defendant might return, it seems unlikely that he would have included the above-quoted note in the affidavit.

privacy represented by this nighttime search. As defendant was not at home, he would not be subject to the frightening prospect of being awakened by the police in the middle of the night. The other residents of the Lighthouse would not be directly implicated by a search of defendant's room. Moreover, it is apparent from the affidavit that the other residents of the Lighthouse knew of the investigation, and knew specifically that investigators were searching for the bedspread.

In these circumstances the Magistrate would have been justified in finding "reasonable cause" for the nighttime search. The serious safety questions posed by the possible return of a person suspected of armed robbery weigh more heavily than any legitimate concerns for the unabrasive intrusion upon privacy involved in *this* nighttime search. As there was "reasonable cause" for a nighttime search even if the affidavit is read together with the omitted information, the omitted information is not material, and there was no violation of rule 41(c).

Finally, even if the nighttime search was conducted in violation of rule 41(c), suppression is not necessarily the appropriate remedy.

There is no Supreme Court or First Circuit precedent directly on point.[9] In *United States v. Searp*, 586 F.2d 1117 (6th Cir.1978), the Sixth Circuit considered whether to suppress evidence obtained in an unauthorized nighttime search. In *Searp*, local and federal law enforcement officials were investigating a bank robbery. Officers sought to arrest the defendant at his mother's house. After learning that defendant was not at his mother's house, and after being refused consent to search the house by defendant's mother, the officers obtained a search warrant. The war-

rant was issued at 11:30 p.m. on a state court form which authorized an "immediate" search. After finding that federal rather than state procedures were applicable and that the affidavit and search warrant did not satisfy the requirements of Rule 41(c)(1), *see* 586 F.2d at 1120–22, the court nevertheless held that suppression was not required. *Id.* at 1122–24.

The Sixth Circuit noted that a search might be in violation of Rule 41(c), but still be considered constitutionally reasonable. In *Searp* the court found that the search was reasonable, in the constitutional sense, because it was conducted pursuant to a valid *state* warrant, and because there was no bad faith violation of Rule 41(c) on the part of the investigating officers, 586 F.2d at 1122. The court was influenced by the facts

> that even though a proper record was not made and a proper authorization was not obtained, any judicial officer would have authorized a night search under these circumstances. Indeed, the Kentucky judge here undoubtedly knew such a search would occur, since he was requested to and did issue the warrant in the middle of the night. Finally, the protection Rule 41(c) provides against frightening surprise searches was not necessary in this case, since it appears clear from the record that Mrs. Sellers knew the police had gone to obtain a warrant and would be returning to search the house.

*Id.*

Thus, the court stated that

> we think it important to differentiate between the *right* to be free from unnecessary and frightening intrusions by the State into our homes in the middle of the night and the *procedures* which have

---

**9.** In *Gooding v. United States,* 416 U.S. 430, 94 S.Ct. 1780, 40 L.Ed.2d 250 (1974), the Supreme Court considered a nighttime search executed in the District of Columbia. As the search was for narcotics, the validity of the search did not turn on Rule 41, but on the Court's interpretation of 21 U.S.C. § 879(a), which provides that searches for controlled substances may be executed at any time if the issuing Magistrate "is satisfied

that there is probable cause to believe that grounds exist for the warrant and its service at such time." *Id. See* 416 U.S. at 458, 94 S.Ct. at 1794 [court holds that § 879(a) "requires no special showing for a nighttime search, other than a showing that the contraband is likely to be on the property or person to be searched at that time."]

been established to protect that right. In this case the defendant's interests have not been violated, though the procedures were not observed.

This does not mean, of course, that violation of the required procedures is unimportant; indeed the procedures are the only way to prevent infringements of individual rights. Rather, we hold that requiring suppression in all cases would be a remedy out of all proportion to the benefits gained to the end of obtaining justice while preserving individual liberties unimpaired.

*Id.* at 1122–23 [emphasis in original].

The Sixth Circuit applied a standard similar to that applied by other courts upon a finding that Rule 41 had been violated:

[T]he particular procedures mandated before a night search may be conducted are not part of the fourth amendment, and we conclude that suppression should not automatically result from any violation of the rules. *A further inquiry into the actual search which occurred is permissible.* The courts should be guided by the principle underlying Rule 52(a), Fed. R.Crim.P., which provides: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

. . . .

When there has merely been a violation of the procedural rules governing night searches, suppression, with its attendant potential for a miscarriage of justice, is not justified when there was neither a possibility of bad faith conduct on the part of the police, nor prejudice to the defendant (in the sense that the search might not have occurred or would not have been so abusive if the requirements of the Rule had been observed)."

586 F.2d at 1124–25 (emphasis added).

In *United States v. $22,287.00 United States Currency,* 709 F.2d 442 (6th Cir. 1983), the Sixth Circuit stated that

the exclusionary rule should not have been applied to the facts of this search at Montez's house because: (1) if the search did actually begin in the "nighttime," it was so soon after 10 p.m. as to make the

infraction *de minimis;* (2) there was a reasonable basis for a nighttime search if such had been expressly sought; (3) there is no indication that the search would have been less "abrasive" if it had been carried out shortly before 10 p.m.; and (4) there is no evidence of an intentional or deliberate disregard of the requirements of Rule 41(c)(1).

709 F.2d at 449.

■ Other courts have taken a similar approach when confronted with a nighttime search not conducted in conformity with Fed.R.Crim.P. 41. In *United States v. Ravich,* 421 F.2d 1196, 1200–02 (2d Cir.1970), the Second Circuit relied on Fed.R.Crim.P. 52(a) in upholding such a nighttime search.

The reason for requiring specific authorization of night searches and for the somewhat higher standard of proof for them imposed by Rule 41, namely, the peculiar abrasiveness of official intrusions at such periods, see *Jones v. United States,* 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958), is wholly inapplicable to two unoccupied motel rooms with police officers stationed nearby to ensure that they remained as they were. "The Fourth Amendment protects people, not places." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507 [511] 19 L.Ed.2d 576 (1967), and the same is true of Rule 41.

421 F.2d at 1201. Finally, *this* court itself has held that failure to comply with other procedural requirements of Rule 41 does not require suppression unless prejudice is shown. *See United States v. Bassford,* 601 F.Supp. 1324, 1332 (D.Me.1985), *aff'd,* 812 F.2d 16 (1st Cir.1987); *United States v. Cresta,* 592 F.Supp. 889, 905 n. 7 (D.Me. 1984) [citing *United States v. Dauphinee,* 538 F.2d 1 (1st Cir.1976) ].

■ Even assuming that the instant search was in violation of rule 41(c), considering the factors noted above and the circumstances of this particular search, the court concludes that suppression would not be appropriate.

First, as discussed above, there is no evidence of bad faith or intentional misconduct on the part of the officers.

Second, the record contains evidence justifying a nighttime search. The investigation was rapidly uncovering evidence that the defendant, who was out of the state and spending money liberally, was the perpetrator of the armed bank robbery. Defendant obviously had the resources to return from Boston at any time. Therefore, the need for speed, combined with the fact that, while defendant remained away from his room at the Lighthouse a nighttime search would not only be safer for the officers and for others in the Lighthouse, but also less intrusive, constituted "reasonable cause" for a nighttime search. *Cf. Ravich*, 421 F.2d at 1201.

Third, as discussed above, the warrant clearly was supported by probable cause.

Fourth, and most significant, there was no prejudice to defendant resulting from any violation of the procedural requirements of Rule 41. Specifically, defendant was not at or near his room at the time of the search, and thus was not subject to an "abrasive" or "frightening" nighttime search. Moreover, there was no frightening intrusion upon any other resident of the Lighthouse. Ms. Carr, the owner of the residence, spoke with the investigators at length and assisted them in searching other parts of the residence. Sheriff Clark knew Ms. Carr personally. In all likelihood, Ms. Carr knew that the officers were seeking a warrant and that they would return; but even if she did not know, it is unlikely (and there is no evidence) that she was "frightened" by the return of officers whom she knew. *Cf. e.g., Searp*, 586 F.2d at 1122 [although the nighttime search was of "a private home occupied by a lone woman who was not suspected of being a participant in the crime," the search was neither frightening nor surprising because the woman "knew the police had gone to obtain a warrant and would be returning to search the house"].

Evidence obtained in a nighttime search conducted contrary to Rule 41(c) will be suppressed only if the search is "unreasonable" in a constitutional sense. The court finds that the nighttime search was not in violation of rule 41(c); alternatively, assuming that this nighttime search violated Rule 41(c), it was not an unreasonable search in the constitutional sense.

### D. *The Seizure Of Specific Items In The Maine Search*

Defendant challenges the seizure of the money and rifle parts on the ground that they were not in "plain view" (and the seizure of the wallet, newspaper, and makeup lotion on the ground that the evidentiary quality of those items was not "immediately apparent").

■ When "the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character," *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564 (1971) [plurality opinion], the plain view doctrine justifies the seizure of that incriminating article. Following the plurality opinion in *Coolidge*, the First Circuit has held that a three-step test must be met for the admission of evidence under the plain view doctrine:

> that the seizing officer have a prior justification for being in a position to see the item in plain view, that the discovery of the item be inadvertent, and that the evidentiary value of the item be "immediately apparent" to the officer.

*United States v. Johnston*, 784 F.2d 416, 419 (1st Cir.1986).

Defendant contends that "a bedspread of the size anticipated by Detective Dickson could not reasonably be expected to be found at the point where the green towel enclosing the packets of bills were [sic] discovered." Defendant's Supplemental Memorandum, at 2. The court disagrees.

■ Essentially, defendant is arguing that the seizure of the towel containing the money does not satisfy the first element of the plain view test. In executing the warrant to search for the bedspread, however, the officers had "prior justification" to be

looking in the places where the towel and money and rifle parts were found. After hearing the testimony of three witnesses, two of whom took actual measurements, there is no doubt as to the dimensions of those parts of the closet from which these items were seized. The towel was wedged in between the back pipe and the right wall of the closet. The back pipe is approximately 6 inches in diameter, and, at its nearest points, is located 5½ inches from the right wall and 1¾ inches from the back wall. Thus, there is a sizable space in the back corner of the closet, above the shelf and behind the pipe. Given the size of this space and the many configurations into which a malleable item such as a bedspread could be compressed for concealment, it was entirely reasonable for Dickson to search this area. It was also reasonable for Dickson to reach up and remove the green towel upon noting that it blocked his view of much of this space. The court finds fully credible Dickson's testimony that he removed the green towel because he thought the towel might in some way conceal the bedspread.[10]

Given that it was reasonable for Dickson to reach up and remove the towel, the packets of money effectively were within his "plain view." Although the currency itself was not visible to the eye, Dickson knew upon touching it that the towel contained currency.[11]

Although the Supreme Court has not considered whether evidence perceived by some sense other than sight is in "plain view," lower courts uniformly have held that the "plain view" doctrine contemplates

other sensory perceptions. As the Fourth Circuit has stated,

> plain view encompasses more than simply seeing contraband. Rather, for an object to be in plain view, it must only be "obvious to the senses." *United States v. Sifuentes,* 504 F.2d 845, 848 (4th Cir. 1974). To be obvious to the senses, contraband need only reveal itself in a characteristic way to one of the senses.

*United States v. Norman,* 701 F.2d 295, 297 (4th Cir.1983) [evidence revealed by smell]; *accord, United States v. Trullo,* 809 F.2d 108 (1st Cir.1987) [touch, where reasonable suspicion justified pat-down search, and touch suggested that weapon was present, search was permissible]; *United States v. Denney,* 771 F.2d 318, 322 (7th Cir.1985) [odor]; *United States v. Mankani,* 738 F.2d 538, 543 (2d Cir.1984) [sound]; *United States v. Agapito,* 620 F.2d 324, 330–31 (2d Cir.1980) [sound]; *United States v. Martinez-Miramontes,* 494 F.2d 808, 810 (9th Cir.1974) [odor]; *United States v. Cobler,* 533 F.Supp. 407, 412 (W.D.Va.1982) [odor]; *United States v. Simpson,* 400 F.Supp. 1396, 1399 (S.D.N.Y.1975) [touch, officer who "instantly" recognized grenade in pat-down search was entitled to reach into defendant's clothing to remove grenade]; *United States v. Pagan,* 395 F.Supp. 1052, 1060 & n. 17 (D.P.R.1975), *aff'd,* 537 F.2d 554 (1st Cir.1976) [odor].

In this case all plain view doctrine criteria are satisfied. The execution of the search warrant justified Deputy Dickson's actions in reaching up and moving the green towel. Upon grasping the towel, it was obvious to Dickson, from his sense of

---

**10.** Dickson testified that he reached up to remove the towel because he thought that it might contain the bedspread, that the bedspread might be behind the towel, or that the towel might conceal a hole into which the bedspread could be hidden. Although it is unlikely that the green hand towel could have contained the bedspread, that fact could not be determined until the towel was removed from the location next to the pipe. In view of the configurations of the pipe and shelf and considering Deputy Dickson's perspective in looking up at the shelf, all of the reasons assigned by Dickson for removing the towel are fully credible and reasonable.

**11.** The testimony of Deputy Dickson and two other officers present at the scene establishes that, upon grasping the towel and money, Dickson exclaimed: "I know what this is." Deputy Dickson's testimony at the suppression hearing established that Dickson had worked for a finance company for 14 years, and had handled large amounts of cash on a daily basis. The court has no doubt that upon grasping the towel in the closet, Deputy Dickson knew instantaneously that the towel was wrapped around packets of money.

touch, that packets of money were wrapped in the towel. As Deputy Dickson was investigating a bank robbery, upon discovery of the money there was more than a " 'practical, nontechnical' probability that incriminating evidence [was] involved." *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) [quoting *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949) ]; *see also Johnston,* 784 F.2d at 419 n. 1. The discovery of the money indisputably was inadvertent, as there is no evidence and no suggestion that investigators knew of the presence of the money in advance and anticipated its seizure. *See Coolidge,* 403 U.S. at 470, 91 S.Ct. at 2040 [discovery of evidence of contraband is not "inadvertent" where the police "know in advance the location of the evidence and intend to seize it …"]. Thus the seizure of the money in the green towel was permissible under the plain view doctrine.

▮ Similarly, the rifle parts are admissible pursuant to the plain view doctrine. The position of the front pipe in the closet created a space which might have concealed the bedspread,[12] and thus it was reasonable for Dickson to search this space. The investigating officers knew that a hand-held weapon had been used in the robbery and that the weapon had been described in a manner which suggested that a sawed-off rifle, rather than a conventional handgun, could have been used by the robber. Thus, considering the collective knowledge of the officers at the time of the search, *see Johnston,* 784 F.2d at 420, the evidentiary quality of the rifle parts was immediately apparent.

▮ The newspaper article, makeup lotion and wallet are admissible under the plain view doctrine. The newspaper article referred to another bank robbery; the Blue Hill Bank robber had also referred to another robbery. The newspaper article was found amongst a pile of newspapers, which could have contained the bedspread listed in the warrant. *See* Government Exhibit

13. The wallet, which was found between the mattress and the coil springs of the bed, was seizable as evidence of the identity of the defendant, and also as evidence of aliases. The lotion was seizable in view of the fact that the Bank robber wore white makeup.

E. *The Sufficiency Of The Cambridge Warrant*

The challenge to the sufficiency of the Cambridge warrant turns primarily upon the sufficiency of the Maine affidavit which was incorporated by reference into the application for the Cambridge warrant. As already discussed, the Maine affidavit was valid.

▮ There was probable cause for the search of defendant's hotel room. In addition to the facts alleged in the Maine affidavit, the affidavit submitted in support of the Cambridge search warrant notes, *inter alia,* that bait money from the Bank was found in defendant's rented room, that rifle parts had been found in defendant's rented room, and that FBI agents had confirmed that defendant was registered in the hotel room to be searched, through July 18, 1986. These facts provided probable cause for the search of defendant's hotel room and safe deposit box.

Defendant also asserts that the Cambridge warrant does not describe with sufficient particularity the items to be seized, particularly the weapon, the money, and the overnight bag. The Supreme Court has stated that

The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.

*Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927),

---

**12.** The position of the front pipe in the closet creates a space approximately 7 inches deep (the 6 inch diameter of the pipe plus 1 inch from the front of the closet to the pipe), 7 inches wide (the distance from the right wall to the pipe), and 107 inches high (the distance from floor to ceiling).

*quoted in Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431 (1965). As the First Circuit has noted, however, the overriding principle of the fourth amendment is one of "reasonableness," and in special circumstances general descriptions are acceptable in search warrants. *United States v. Fuccillo,* 808 F.2d 173, 175 (1st Cir.1987).

> [G]eneral descriptions are permissible only in "special contexts in which there [is] substantial evidence to support the belief that the class of contraband [is] on the premises and in practical terms the goods to be described [can] not be precisely described." *Montilla Records of Puerto Rico v. Morales,* 575 F.2d 324, 326 (1st Cir.1978). In *United States v. Klein,* 565 F.2d 183 (1st Cir.1977), we set forth two tests which in particular circumstances may help to illuminate whether this principle is satisfied: first, the degree to which the evidence presented to the magistrate establishes reason to believe that a large collection of similar contraband is present on the premises to be searched, and, second, the extent to which, in view of the possibilities, the warrant distinguishes, or provides the executing agents with criteria for distinguishing, the contraband from the rest of an individual's possessions.

*Id.* at 175–176.

■ Defendant's argument as to the description of the weapon need not be considered, as no weapon was found. Even if the description of the weapon was overbroad, the remedy would be suppression of the weapon alone, not a blanket suppression of all evidence seized under the warrant. *United States v. Riggs,* 690 F.2d 298, 299–300 (1st Cir.1982); *see generally Annot.,* 69 ALR Fed. 522, 527–32 (1984), and cases cited therein.

■ The affidavit presents evidence satisfying the requirements for authorizing a search for "twenty and one hundred dollar bills." The description of the money is based upon the Bank's information that the stolen money was in the denominations of $20 and $100 bills. All of the evidence contained in the affidavits, and recounted above, provides reasonable cause to believe that a large amount of such currency might be found at the premises to be searched. Lastly, there simply is no more particular way to describe stolen money. *Cf. Fuccillo,* at 176. The search warrant described the money with sufficient particularity.

Defendant's challenge to the description of the overnight bag rests on asserted differences in the description of the item to be seized:

> [T]he Boston affidavit and warrant make reference to a "brown leather overnight bag with a hand carrying strap and zipper." On the other hand, the information conveyed to law enforcement officials by Ms. Curtis refers to a bag with a *"handle* on the top...." (Affidavit at paragraph 6.) (Emphasis added.) Because of the different descriptions, the affidavit effectively authorizes the seizure of a different article than that described in the affidavit itself. Surely, a bag with a handle on the top appears much differently than that with a hand carrying *strap.*

Defendant's Memorandum, at 12. Defendant also contends that the description of the luggage as "an overnight bag" is insufficient because the Maine affidavit contains a more detailed description of the luggage.[13]

■ The court finds that the warrant describes the luggage with sufficient particularity. The description contained in the affidavit is no more specific than the description contained in the warrant. *See* note 13, *supra.* Defendant has not articulated, nor can the court discern, any consistent and uniformly recognized difference

---

13. The Maine affidavit states:

> 25. Ms. Carr told Sheriff Clark that Peller had a full set of expensive luggage made of real leather, medium brown in color, one piece of which was approximately 18 inches to 24 inches long and six inches deep. It has a real leather strap on it and a zipper. She said that he took good care of the luggage and she had observed him polishing it earlier in the week (the week of July 7).

Government Exhibit 1, at ¶ 25.

between a "handle" and a "hand carrying strap." Moreover, the rest of the description contained in the warrant identified the luggage with sufficient particularity so as to make highly unlikely the seizure of an item for which no probable cause had been shown.[14]

### F. *Execution Of The Cambridge Search Warrant*

Defendant contends that the search of the Cambridge hotel room without the warrant in hand rendered the search invalid. Defendant also contends that items seized from his hotel room did not have any "immediately apparent" evidentiary value and therefore must be suppressed.

■ It was not necessary for the FBI agent to have the warrant in hand prior to executing the search. "Courts have repeatedly upheld searches conducted by law enforcement officials notified by telephone or radio once the search warrant issued." *United States v. Bonner*, 808 F.2d 864, 868 (1st Cir.1986) [citations omitted]. In the present action, it is not clear whether there has been a violation of Rule 41(d).[15] However, even if there has been a violation, there has been no showing which would warrant suppression. *See id.*, at 869 [violation of Rule 41(d) results in suppression only if search would not have occurred, or would not have been so "abrasive," absent the violation].

The Government contends that the seizure and the inventory of all of defendant's possessions were necessary because of the known transience of defendant's occupancy of the hotel room. Defendant asserts that the hotel room was equivalent to a dwelling for fourth amendment purposes, Defendant's Reply Memorandum, at 9 (citing *United States v. Griffith*, 537 F.2d 900 (7th Cir.1976)), and alternatively, that even if an inventory was justified, it was unnecessary to open individual pieces of luggage.

■ The lawfulness of an inventory search of the belongings of an arrestee known to be staying in a hotel or other temporary abode is unsettled. At least two circuits have rejected the view, here advanced by the Government, that such belongings may be seized and inventoried. *See United States v. Lyons*, 706 F.2d 321, 331–35 (D.C.Cir.1983); *United States v. Griffith*, 537 F.2d 900, 905 (7th Cir.1976). State court decisions suggest several different approaches to this issue. *See Lyons*, 706 F.2d at 333 n. 20 [discussing state court decisions]. Summarizing the cases, one commentator states:

No less than three different views are to be found in the cases. One is that the motel or hotel arrest is to be treated exactly like the at-home arrest, so that the officers have "no greater right to remove or search defendant's personal belongings that were not on his person or within his immediate control than they would have if they had made the arrest in his house." At the other extreme, it has been held that removal of the defendant's effects from his motel room is proper, at least when the defendant does not "offer any objection or suggest any other arrangement for the safekeeping of [his] possessions," because the hotel or motel management cannot be expected "to permit those belongings to remain indefinitely in the vacated room." The

---

**14.** In contrast to Ms. Carr's description, *see* note 13 *supra*, the warrant described the luggage sought as a "brown leather over-nite [sic] bag with a hand carrying strap and zipper." However, the Maine affidavit also contains the following description:

6. The [robber] took the two bags from Ms. Curtis, placed them in a leather "overnight" bag. Ms. Curtis described this bag as brown, genuine leather bag with a handle on the top and a [sic] zipper openings on the side. She further described the color as a medium brown.

The description of the luggage sought in the warrant is a composite of the two descriptions, and is sufficiently particular.

**15.** Federal Rule of Criminal Procedure 41(d) states, *inter alia,* that:

The officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken or shall leave the copy and receipt at the place from which the property was taken.

Fed.R.Crim.P. 41(d).

middle ground is that since the law does not "place any responsibility on the [police] for the care of defendant's property located in the motel room" and adequately protects the innkeeper "by statutory provisions limiting the liability of an innkeeper for loss of guests' property," it is only the defendant's interests which are at stake, meaning the police are obligated to give him "the choice of leaving his belongings in the motel room or requesting the [police] to take them into custody for him."

2 W.R. LaFave, *Search and Seizure* § 5.5 at 357–58 (1978 & Supp.1986) [footnotes omitted].

The present case differs significantly from most inventory cases. In most inventory cases there is no warrant. Instead, the police uncover evidence in a warrantless search, and subsequently seek to justify the search on the basis that an inventory was necessary to safeguard the property following defendant's arrest or detention. As the Supreme Court has stated,

> The justification for such searches does not rest on probable cause, and hence the absence of a warrant is immaterial to the reasonableness of the search. Indeed, we have previously established that the inventory search constitutes a well-defined exception to the warrant requirement. See *South Dakota v. Opperman*, [428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976)]. The Illinois court and respondent rely on *United States v. Chadwick*, 433 U.S. 1 [97 S.Ct. 2476, 53 L.Ed.2d 538] (1977), and *Arkansas v. Sanders*, 442 U.S. 753 [99 S.Ct. 2586, 61 L.Ed.2d 235] (1979); in the former, we noted that "probable cause to search is irrelevant" in inventory searches and went on to state:
>
> > "This is so because the salutary functions of a warrant simply have no application in that context; the constitutional reasonableness of inventory

searches must be determined on other bases." 433 U.S., at 10, n. 5 [97 S.Ct. at 2483, n. 5].

A so-called inventory search is not an independent legal concept but rather an incidental administrative step following arrest and preceding incarceration. To determine whether the search of respondent's shoulder bag was unreasonable we must "balanc[e] its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Delaware v. Prouse*, 440 U.S. 648, 654 [99 S.Ct. 1391, 1396, 59 L.Ed.2d 660] (1979).

*Illinois v. Lafayette*, 462 U.S. 640, 643–44, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65 (1983) [footnote omitted; upholding search of container as part of inventory search].

In the instant case, the FBI agents waited for a search warrant to issue before entering defendant's hotel room. The warrant authorized a search for items such as colored bank currency wrappers and twenty and one hundred dollar bills. Upon receiving notification that the warrant had issued and being informed of some of the items for which the search was being conducted, Agent Jackson conducted a cursory search of the items of luggage to see if any of the search items were in sight. Contrary to defendant's objections, it is only by conducting such a cursory search that an investigator is able to determine whether a more extensive search is necessary. *See* 2 W.R. LaFave, *Search and Seizure* § 4.10(d) (1978).

Once a cursory search failed to disclose any of the items identified in the search warrant, Agent Jackson was confronted with the following circumstances: defendant was in custody and his right to occupy room 1032 either had expired or was about to expire.[16] Execution of the search warrant would require a thorough search of the defendant's belongings found in room 1032, and there was probable cause to be-

---

16. It is not entirely clear how long defendant intended to stay at the Hyatt. At the hearing, Agent Sangillo testified that, as a result of the investigation in Boston, he learned that defendant was going to leave the Hyatt on Wednesday, July 16. However, the affidavit submitted with the application for the Cambridge search warrant states that defendant "had reserved room 1032 until July 18, 1986." Government Exhibit 3, at ¶ 6. However, there is no evidence that the defendant intended to stay at the Hyatt for any extended length of time.

lieve that among those belongings would be found a weapon and the fruits of the Bank robbery.

■ In these circumstances the court finds that it was entirely reasonable for the FBI to seize defendant's belongings so that the search warrant could be executed and an inventory could be conducted at the FBI offices. These legitimate governmental interests outweigh whatever slight intrusion on defendant's fourth amendment rights may have been involved in the seizure and removal of his belongings from the hotel room. *See Lafayette, supra.* By virtue of the valid search warrant for the hotel room, defendant retained virtually no privacy interest that could be infringed by such an inventory. Of course, defendant had a possessory interest in his luggage, at least unless it was seizable as evidence. But with defendant in custody and his right to occupy room 1032 about to expire, soon somebody other than defendant necessarily would have had to take custody of the luggage. Thus, in this case the only interference from the inventory search was that the FBI, rather than the Hyatt, took custody of defendant's possessions. Defendant has not established any prejudice to his possessory interests as a result of the FBI's seizure.[17] In contrast, beyond the administrative concerns which justify the inventory search exception, *see Lafayette, supra,* the Government had a strong interest in the orderly execution of the search warrant.

Therefore, in these circumstances the court concludes that the FBI lawfully seized defendant's belongings from the hotel following his arrest.

## CONCLUSION

For the foregoing reasons, the motion to suppress the Castine and Cambridge evidence is DENIED.

SO ORDERED.

---

17. Defendant has not contended, for example, that the Government has interfered with his possessory interests by refusing to turn over his

possessions (those that are not evidence) to an authorized third party.