**STATE of Maine**

v.

**Robert P. INMAN.**

Supreme Judicial Court of Maine.

March 13, 1973.

Malcolm L. Lyons, Asst. Atty. Gen., Augusta, Peter W. Culley, Asst. Atty. Gen., for plaintiff.

Stern & Stern, by Marshall A. Stern, Bangor, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, POMEROY, WERNICK and ARCHIBALD, JJ.

POMEROY, Justice.

By using the technique authorized by Rule 37A(a), Maine Rules of Criminal Procedure, this motion to suppress evidence is before us without any decision thereon having been made by the Justice below.

The agreed statement manifests that movant Robert P. Inman has been charged with unlawful homicide under such circumstances as to constitute murder, by indictment returned by the Grand Jury for Penobscot County in September, 1971.

Earlier, on August 30, 1971, while the matter was pending in the Superior Court after probable cause had been found against the defendant in the District Court, the defendant filed a motion to suppress *"12 head hairs and 2 palm prints* [one print each hand]*"* alleged to have been improperly and unlawfully obtained by the State and to enjoin the State from presenting or using the 12 head hairs or any of them or the 2 palm prints or either of them as evidence either before the Grand Jury or in any other proceeding.

We are here concerned only with the question whether or not the evidence may be used in a trial which may result from the indictment returned by the Grand Jury.

The movant bottoms his claim that the evidence came into the hands of the State in contravention of his constitutional rights on the conclusion he would have us draw from these agreed facts: The semi-nude beaten, lifeless body of Charlotte Dunn was found at 10 a. m. June 1, 1971, in her apartment in Bangor, Maine. An autopsy revealed that she died by violent means (a fact which should have been obvious from mere observation as she had sustained severe bruises, hemorrhages and numerous fractures.)

Investigation by State Police Detectives and Technicians from the State Bureau of Identification disclosed the existence of a latent palm print impression on the floor of her apartment adjacent to Miss Dunn's body. This palm impression was photographed and *"lifted"* by personnel of the State Bureau of Identification. At the same time it was discovered there was what appeared to be a dark hair clutched between the lifeless Miss Dunn's thumb and forefinger.

On the next day, June 2, 1971, the defendant was questioned, in the words of the agreed statement *"as a suspect regarding the crime."* While he was not arrested on that day, he continued to be a suspect in the crime of unlawfully killing Miss Dunn.

On June 26, 1971, a member of the Maine State Police followed the defendant in his car from his home in Holden until, upon reaching State Street, in Brewer, he was arrested and charged with the crime of speeding. Immediately thereafter he was taken to the Bangor Police Department where his palm prints were recorded by a Detective of the Maine State Police Department.

On July 1, 1971, the defendant entered a plea of not guilty to the charge of speeding and after trial was convicted, sentenced to pay a fine of $15.00 and did pay such fine. In the meantime the palm prints which had been taken at the Bangor Police Station remained in the custody of the State Police. The right palm print, when compared by one who professed to be an expert in dactylography, was found to be identical to the latent palm print impression found adjacent to the body of Charlotte Dunn.

On July 20, 1971, Dale Ames, a Detective in the Maine State Police Department, sought a search warrant from a Judge of

the District Court in Bangor. A search warrant was issued authorizing a search of the person of Robert P. Inman to obtain *"the prints of the palms of the hands of one Robert P. Inman and 12 hairs from the scalp of said Robert P. Inman; that said property is non-testimonial evidence which will aid in the conviction for murder of Charlotte Dunn of Bangor, Maine."*

The affidavit in support of the search warrant consisted of six typewritten pages. As the basis for probable cause for believing there was non-testimonial evidence which would aid in the conviction of Robert Inman, the affidavit recited the facts surrounding the discovery of the semi-nude lifeless body of Charlotte Dunn.

Of some significance is the recitation that the affiant observed Miss Dunn's nightgown and robe had been ripped open from the front, exposing the entire front portion of her body, and the clothing was wrapped around the victim's shoulders; that the pathologist had determined the cause of death was asphyxia secondary to strangulation; that a named witness had stated to affiant that he occupied an apartment adjacent to Miss Dunn's and that at 11:55 p. m., May 31, 1971, he was awakened by screams and heard a woman shout, *"Don't hit me again, don't hit me again;"* that he heard muffled moaning sounds for approximately five minutes thereafter; that Robert Inman is a former tenant of the apartment house in which Miss Dunn resided and that during that time Miss Dunn collected rents from the tenants; that Inman is presently under indictment in Penobscot County for the crime of burglary, the victim of which is a 74-year old woman living in Holden, Maine. This victim had told the affiant that on September 17, 1970, a white male about 25 years old, approximately 6 feet tall, who weighed about 175 pounds, had long brown hair, broke into her home in Holden; that he beat her and attempted to sexually molest her.

The affiant then stated that from his personal observation Robert P. Inman fit the description given him by the burglary victim; that 2 women who lived in the trailer park in which Inman lived, had given a statement to the State Police Officer which statement was in the State Police files, reciting that both knew Robert P. Inman and that on the evening of Sept. 17, 1970, while enroute to their home they observed a vehicle fitting the description of Inman's vehicle, which passed them on the highway. Later they observed the car unoccupied in the vicinity of the burglary victim's home and that Inman was not seen by them on the highway at any time between the point where they saw his automobile and their arrival at the trailer park where both he and they lived.

The affidavit continued that when Inman was interviewed by a State Trooper on September 24, 1970, Inman stated that he had stopped his vehicle on the evening of September 17th in the vicinity described by the women but that he did so because the indicator light had warned him the motor was hot. He claimed he left the car where it was and walked home; that Inman was convicted of breaking, entering and larceny in the nighttime in 1961, and that he was convicted of indecent exposure in the Bangor Municipal Court in 1963.

During the course of the interview with Inman following the burglary of September 17, 1970, the interrogating officer noticed several healing wounds *"on the backs of the hands of Robert Inman."* When Inman was interviewed on June 1, 1971, by a Detective of the Maine State Police in the Bangor Police Department in connection with the homicide of Miss Dunn, the Detective noticed scratches on the back of Inman's hands and noticed scratches on his neck and face and abrasions on the elbows. At that time Inman said he did not know where the abrasions on his elbows and the scratches on his face came from, but the scratches on his hands were received when he was erecting a fence at his home; Inman also told the interviewer that he had been at his home from 5:00 p. m. on May 31, 1971, until he left for work on the

morning of June 1st; that a named witness had told the State Police Detective that he was in the Oasis Bar on State Street, Bangor, on the evening of May 31, 1971, at approximately 10 p. m., playing pool with Inman; that the witness noticed that Inman was wearing a short-sleeved shirt and there were no scratches on his hands or arms at that time. The witness stated he took Inman home at approximately 11 p. m. on the evening of May 31st; that the affiant interviewed Inman's wife on June 8, 1971, and that she stated her husband left home at approximately 5 p. m. in the afternoon and did not arrive home again until approximately 10:30. She said she had gone to bed and that her husband came to bed at approximately 11 p. m.; that she stayed awake for about 15 minutes and thereafter remained asleep, and that the next day her husband pointed out some scratches on his arms, neck and face and that she recalled seeing only one of these marks previous to June 1st, that mark being a gouge caused while he was putting up a fence on May 30, 1971. Mrs. Inman also told the affiant that it was a 25 minute trip by car from the Inman home to Bangor.

The sufficiency of the allegations in the affidavit to constitute *"probable cause"* is assailed by this motion to suppress.

As the motion is reported to us, the issues are:

1. Are the palm prints of Robert P. Inman taken after the arrest for speeding on June 26, 1971, admissible?

2. Are the palm prints of Robert P. Inman taken pursuant to the search warrant of July 20, 1971, admissible?

3. Are the palm prints taken pursuant to the arrest of Robert P. Inman on the charge of murder of Charlotte Dunn admissible?

On the occasion the palm prints were taken in the Police Station in Bangor, following the speeding arrest, the police purported to act pursuant to 25 M.R.S.A. 1542 which provides:

*"The State Police . . . shall have the authority to take or cause to be taken, and shall take or cause to be taken, the fingerprints or photographs or both the fingerprints and photographs of any person in custody charged with the commission of crime . . . ."*

We hold that the taking of Inman's palm print subsequent to his arrest for speeding was authorized by this statute.

■ At no point during the enactment or amendment of the *"fingerprint statute"* does the Legislative Record indicate how broadly the word *"fingerprint"* should be construed. There is, however, ample evidence of what objects the Legislature intended to realize by the enactment of the statute. The duty of this Court is to interpret the language of the statute so as to carry out the obvious purpose the Legislature had in mind. Emple Knitting Mills v. City of Bangor, 155 Me. 270, 153 A.2d 118 (1959).

It is apparent from the language of 25 M.R.S.A. 1542 that the Legislature intended at least three uses be made by police of fingerprints lawfully taken.

(a) Fingerprints were to be used to identify the person in custody, i. e., to prove that he is or is not who he claims to be.

(b) They would be recorded and used in the investigation of crimes and the prosecution of criminals.

(c) They would be used to identify fugitives from justice.

As to purpose (a), little in life is more certain than that a correctly interpreted fingerprint when properly compared with a

known print will establish or deny identity.[1]

As to purpose (b), fingerprints can be said to have both reliability and probative value. When one's fingerprints are found in a particular place such person cannot be heard to say he was not at that place at some time. The probative value of fingerprints in the investigation and prosecution of crime is, therefore, obvious.

Experts in dactylography recognize that palm prints have the characteristic of uniqueness and that they contain reference points that enable accurate and conclusive comparisons just as do fingerprints. Wharton, Criminal Evidence § 272 (11th ed. 1935); Underhill, Criminal Evidence § 135 (5th ed. 1956).

■ Courts also have recognized that there is little or no difference between the methods used in the comparison of palm prints and in the comparison of fingerprints. Since palm prints are a valuable and an accurate means of identification, they are of sufficient probative worth to be admitted as evidence. See People v. Les, 267 Mich. 648, 255 N.W. 407 (1934); State v. Kuhl, 42 Nev. 185, 175 P. 190 (1918); and cases collected in 28 A.L.R.2d 1127–1131.

■ Construing the word *"fingerprints"* in 25 M.R.S.A. 1542 to include palm prints, furthers the obvious purposes for which that statute was enacted. We are convinced that this construction does not do violence to the plain meaning of the words of the statute. Pease v. Foulkes, 128 Me. 293, 147 A. 212 (1929).

■■ In construing the word *"fingerprints"* we may look to the original statute, and to the usage of the word in the jurisprudence of the time. Cram v. Inhabitants of Cumberland County, 148 Me. 515, 96 A.

2d 839 (1953). In the early part of this century we find that fingerprint was considered to include palm prints. A noted treatise on criminal evidence gave the following definition:

*"The word* 'finger-prints' *may be said to embrace any impression, print or stain, made by the tips of the fingers or thumbs, or by the palmer surfaces of the hands."*

Underhill, Criminal Evidence § 865 (4th ed. 1935). State v. Kuhl, supra, contains an exhaustive history of the development of the science of fingerprinting. This history leads, inevitably, to the conclusion that *"fingerprint"* is a generic name for impressions of the papillary ridges or friction skin which are not confined to the human finger alone but are found with equal importance and equal persistency in the human palm.

■ Inman contends that speeding is not a *"crime"* as that term is used in 25 M.R.S.A. 1542.

We cannot agree with this contention.

The history of *"fingerprinting"* legislation in Maine indicates a continuous broadening of the class of persons whose fingerprints may be taken. P.L.1911, c. 5, provided for the fingerprinting of convicted felons. P.L.1929, c. 325, §§ 1–3, provided that, with court authorization, fingerprints could be taken from those in custody who were chanrged with a felony. P.L.1937, c. 91, § 2 (in effect the present statute), gave State Police authority, without court approval, to fingerprint any person in custody charged with a crime.

The word *"crime"* was intended to include something more than *"serious offenses"* as argued by movant.

Speeding is made unlawful by 29 M.R.S.A. 1251. A conviction for speeding may

---

1. There is no practical possibility of a duplication of fingerprints. The lowest known estimate by a recognized expert of the risk of duplication of a single finger-print is said to be one in 64 billion. Underhill, Criminal Evidence § 142, p. 269 (5th ed. 1956).

result in a fine of up to $100, or by imprisonment for not more than 90 days, or by both. 29 M.R.S.A. 2303. An act made unlawful and subject to such penalties may properly be labeled a *"crime"*.

In Rog v. Eltis, 269 Mass. 466, 169 N.E. 413 (1929), the Massachusetts Court in describing a violation of a statute requiring motor vehicle operators to be licensed, said:

> *"Having no license to operate, it was of itself a crime on the part of the defendant to attempt to operate the automobile on the public way."* 269 Mass. at 468, 169 N.E. at 414.

Movant relies on several New York decisions in his argument that traffic offenses are not crimes. These cases are, however, distinguishable. New York has a statute classifying traffic offenses as *"infractions"* as distinguished from other violations of penal laws, i. e., *"crimes."* Yet, even in New York, this distinction is not absolute. In Squadrito v. Griebsch, 1 N.Y.2d 471, 154 N.Y.S.2d 37, 136 N.E.2d 504 (1956), it was held that notwithstanding the statutory distinction, speeding is a *"crime"* under a statute authorizing arrest without warrant for any *"crime"* committed in the presence of a police officer.

■ Movant's next argument against the admission of the first palm print is that although the procedure is authorized by 25 M.R.S.A. 1542, it is a violation of his rights under the Fourth Amendment. Movant relies on Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). We hold that fingerprinting a person validly in custody is not to conduct a search protected by the Fourth Amendment. If the seizure of the person and detention is lawful, the taking of fingerprints or a palm print does not infringe upon any interest protected by the Fourth Amendment. United States v. Dionisio, —— U.S. ——, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973).

Many courts have held that peace officers have a common law power to fingerprint persons who have been arrested. United States v. Laub Baking Co., 283 F. Supp. 217, 220–221 (N.D.Ohio 1968), and cases cited therein. A statute directing the taking of the fingerprints of any person arrested for an indictable offense was held not to be a violation of Fourth Amendment rights in McGovern v. Van Riper, 137 N. J.Eq. 548, 45 A.2d 842 (1946).

Federal cases prior to Davis v. Mississippi are in accord. In United States v. Laub Baking Co. the Court was of the opinion that fingerprinting was not a search under the laws of the Sixth Circuit. United States v. Iacullo, 226 F.2d 788 (7th Cir. 1955), holds that fingerprinting a defendant after a valid arrest is not an unlawful search and seizure. In Smith v. United States, 117 U.S.App.D.C. 1, 324 F. 2d 879, 882 (1963), Judge (now Chief Justice) Burger stated in holding a post arrest palm print admissible, that *". . . it is elementary that a person in lawful custody may be required to submit to photographing . . . and fingerprinting . . . as part of routine identification processes."* Chief Judge Aldrich, speaking for the Court in Napolitano v. United States, 340 F.2d 313, 314 (1st Cir. 1965), declared that fingerprints taken before defendant was admitted to bail were admissible. *"Taking of fingerprints in such circumstances is universally standard procedure, and no violation of constitutional rights."*

Both Judge Aldrich and Chief Justice Burger distinguished cases, such as Bynum v. United States, 104 U.S.App.D.C. 368, 262 F.2d 465 (1958), in which the fingerprints had been taken prior to arrest.

Davis v. Mississippi had no effect on this line of cases. Mr. Justice Brennan in setting forth the issue in *Davis* stated:

> *"The only issue before us is whether fingerprints obtained from petitioner should have been excluded from evidence as the product of a detention which was illegal under the Fourth and Fourteenth Amendments."* 394 U.S. at 722, 89 S.Ct. at 1395. (Emphasis added)

The issue set forth and the holding of the case is that Davis' detention was illegal. After so finding, the Court reversed on the grounds that unlawfully obtained evidence had formed the basis of the finding of guilt. Nowhere in the *Davis* opinion does the Court discuss fingerprinting once a person is in lawful custody. The dicta concerning warrants and standards of probable cause to gain custody without a warrant is of no concern in the instant case as Inman was in custody pursuant to a valid arrest for speeding.

Decisions since Davis v. Mississippi indicate that the law regarding fingerprinting of those in valid custody is unchanged. In United States v. Holland, 438 F.2d 887 (6th Cir. 1971), the Court held that a photograph, taken after the crime but prior to arrest, which was used to identify defendant as the guilty party, was not a violation of Fourth Amendment rights. *Davis* was distinguished because defendant voluntarily went to F.B.I. headquarters, therefore the custody problem of Davis did not exist. In United States v. Aloisio, 440 F.2d 705 (7th Cir. 1971), defendant was fingerprinted after arrest. The complaint was later dismissed but defendant was subsequently indicted for the same offense. His argument that the fingerprints should be suppressed was denied. *Davis* was distinguished because the defendant had been arrested on probable cause and was in lawful custody when the fingerprinting took place. In United States ex rel. Hollman v. Rundle, 461 F.2d 758 (3rd Cir. 1972), the Court allowed the use of photographs taken while appellant was under detention. *Davis* was not applicable because the Court found there was probable cause to arrest the appellant.

The rationale of this line of cases is this: The Fourth Amendment by its terms guarantees to the people the right to be secure in their persons (among other things) against unreasonable searches and seizures and no warrant for search or seizure shall issue but upon probable cause, particularly describing the person to be seized.

The gravamen of the unconstitutional conduct of the police in *Davis* was the legally unjustified seizure and detention of Davis' person, there being no warrant issued and no probable cause existing for such seizure. A fingerprint taken under those circumstances automatically became a fruit resulting from the constitutionally proscribed seizure of the person. The conduct prohibited by the Fourth Amendment was *the unreasonable seizure of the person.*

Mr. Justice Brennan, speaking for the Court in *Davis,* quoted extensively from *Bynum,* supra, and then immediately wrote:

*"We turn then to the question whether the detention of petitioner during which the fingerprints used at trial were taken constituted an unreasonable seizure of his person in violation of the Fourth Amendment."* 394 U.S. at 724–725, 89 S.Ct. at 1396. (Emphasis supplied)

Once a person is lawfully in custody, the taking of his fingerprints *after his arrest* is procedure not proscribed by the Fourth Amendment.

*"Taking of fingerprints in such circumstances is universally standard procedure, and no violation of constitutional rights."* (Citations omitted) Napolitano v. United States, supra.

Fingerprints are an unchanging physical characteristic. A person legally arrested and in custody can no more prevent the police from ascertaining the characteristics of the papillary ridges of his fingers or palms or feet than he can prevent the police from ascertaining the color of his eyes, the color of his hair, or the shape of his nose or any other patent physical characteristic. There is nothing in one's fingerprints which ought be protected by probable cause or warrant requirements once he is in custody agreeably to the Fourth Amendment of the Constitution.

By the very reason of their nature it cannot be considered that there is a consti-

tutionally protected expectation of privacy as to the characteristics of the fingerprint pattern of one validly in police custody any more than it can be said there is a constitutionally protected expectation of privacy as to any other outward physical characteristic of one whose person has been validly seized.

Inman also argues that his arrest for speeding was a *"sham,"* and therefore the palm print taken pursuant to that arrest should be suppressed. The claim is that the police used the arrest as a facade in order to conduct a search that would not otherwise have been permissible. Such *"sham"* arrests, made solely to justify searches incident to the arrests, have resulted in the suppression of the fruits of the search and in the arrest being held unlawful. Taglavore v. United States, 291 F.2d 262 (9th Cir. 1961); Barnes v. State, 25 Wis.2d 116, 130 N.W.2d 264 (1964).[2]

No claim has been made either in the briefs or at oral argument that Inman was entrapped. Indeed no such claim could be sustained on the agreed statement of facts before us.[3]

A discussion of the *"sham arrest"* claim Inman makes is unnecessary.

■ We are satisfied from a careful examination of the agreed statement of facts and the recitations contained in the affidavit on the basis of which the search warrant was issued, that at the time the police arrested Inman for speeding they had in their possession information sufficient in legal effect to constitute probable cause to arrest him for the unlawful homicide of Miss Dunn. That they erroneously thought otherwise does not change the legal effect of the facts.

It is not claimed there was fraud upon Inman and it is clear that he was not prej-udiced by the fact that the palm printing was made as the result of his arrest for speeding rather than an arrest for unlawful homicide for which there existed probable cause.

■ The second palm print was taken while he was in custody pursuant to a search warrant. The admissibility of that print depends on the validity of the seizure of his person and detention under the search warrant. The appropriate test is, if the facts in the affidavit and the reasonable inferences drawn therefrom were *"such that a reasonably discreet and prudent person would be led to believe that* [Robert Inman had caused the death of Charlotte Dunn], *then there was probable cause justifying the issuance of the search warrant."* State v. Appleton, Me., 297 A. 2d 363 (1972). We hold that the warrant was properly issued.

The principles established by the Supreme Court of the United States for testing the validity of a search warrant are summarized in State v. Hawkins, Me., 261 A.2d 255, 259 (1970). See also Rosencranz v. United States, 356 F.2d 310 (1st Cir. 1966).

■ ■ Movant cites authority for the proposition that the warrant cannot stand upon evidence of prior convictions or knowledge of movant's physical appearance. Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). But the warrant in the instant case does not rest solely on such evidence. To determine the existence or non-existence of *"probable cause"* we must look to *all* the allegations in the affidavit.

The statements of the two neighbors of Inman concerning the events of September 17, 1970, were given to a policeman other than the affiant, then relayed to the af-

---

2. We need not indicate what conclusion we would reach if we were called upon to decide a case in which the facts were the same as or similar to the facts in *Taglavore* and *Barnes*.

3. The law of Maine as to the defense of entrapment is fully set forth in State v. Calanti, 142 Me. 59, 46 A.2d 412 (1946), and more recently in State v. Gellers, Me., 282 A.2d 173 (1971).

fiant. Movant challenges the use of *"hearsay on hearsay"* in establishing probable cause. United States v. Roth, 391 F.2d 507 (7th Cir. 1967). That case precludes hearsay as to which there is absent any indication of the reliability of the *"anonymous"* source. The circumstances of the instant case do not fall within the rule of *Roth.*

The source is not anonymous. Both neighbors are named. State v. Collins, N. H., 298 A.2d 742 (1972). The reliability of the statements is indicated by the fact that they are the result of personal observation and further, that portions of the statements were verified by Inman in his statement to the police.

The facts adduced before the magistrate have been previously set forth. It is sufficient here to emphasize certain of these facts. Inman knew the deceased as he formerly had been a co-tenant. The crime, including its sexual overtones, was strikingly similar to a crime for which Inman had been indicted by the Penobscot County Grand Jury. The physical scars sustained by Inman sometime between the hour of 11:00 p. m. on May 31, 1971, and the morning of June 1, 1971, are the type of wounds which a woman under sexual attack might inflict. State v. Iverson, N.D., 187 N.W.2d 1, 19–20 (1971), cert. denied, 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971). These facts, when supplemented by the remaining evidence presented to the magistrate, constitute probable cause to believe that it was movant's palm print which was *"lifted"* from beside the body of Charlotte Dunn.

The State contends that the third palm print was lawfully taken incident to Inman's arrest for murder. The search incident to arrest doctrine is not applicable. Were this a *"search,"* the controlling rationale was set forth by Justice Frankfurter in his dissent in United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950).

> *"Why is search of the arrested person permitted? For two reasons: first, in order to protect the arresting officer and to deprive the prisoner of potential means of escape, . . . and, secondly, to avoid destruction of evidence by the arrested person."* 339 U.S. at 72, 70 S.Ct. at 437.

But, *Dionisio,* supra, holds fingerprinting one in lawful custody infringes no interests protected by the Fourth Amendment.

For the reasons already set forth, we hold that the palm print taken after Inman was arrested for *"murder"* was lawfully taken pursuant to 25 M.R.S.A. 1542.

The entry must be,

Motion to suppress the palm prints denied.

Remanded to the Superior Court for further proceedings consistent with this opinion.

All Justices concurring.