DONALD L. GARBRECHT
LAW LIBRARY

MAR 3 2004

STATE OF MAINE
PENOBSCOT COUNTY

SUPERIOR COURT
CRIMINAL ACTION
DOCKET NO. CR-03-127
EAH - PEN- 2/13/2004

)
STATE OF MAINE,                )
                               )
                Plaintiff      )
                               )
        v.                     )
                               )
ROSCOE SARGENT,                )
                               )
                Defendant      )
                               )
_____)

**DECISION ON MOTION
TO SUPRESS EVIDENCE**

FILED & ENTERED
SUPERIOR COURT

FEB 13 2004

PENOBSCOT COUNTY

Pending before this Court is the Defendant's Motion to Suppress Evidence. On December 1, 2003, the Court conducted a testimonial hearing in connection with this motion. Andrew B. Benson for the State; Joseph M. Pickering and Christopher R. Largay for the Defense.

## FINDINGS OF FACT

Based on the evidence presented at the hearing, the Court makes the following findings of fact. On January 6, 2003 the Defendant was on federal probation and was awaiting trial on pending federal criminal charges. The federal court had previously released him on "conditional pretrial release." The court had appointed Attorney Brett Baber to represent him. At approximately 8:10 a.m. on January 6th, the Defendant, accompanied by his attorney, entered the Margaret Chase Smith Federal Building (Federal Building) in Bangor for the sole purpose of surrendering to federal authorities (U.S. Marshals) for violating the terms of his federal probation. Upon entering the building, Attorney Baber told a security officer, Kenneth Smart, that his client wanted to

surrender to the U.S. Marshall's office and that the Defendant was carrying a knife in his backpack.

The Defendant confirmed the fact that he was carrying a knife in his backpack to Officer Smart. At this point, Officer Smart put the Defendant's backpack through the X-ray machine where he observed the outline of the knife. With the Defendant's permission, Officer Smart opened the backpack, and observed the knife, which appeared to have bloodstains on its five-inch long blade. Officer Smart asked the Defendant to take the knife out and give it to him and the Defendant did so.

The U.S. Marshall's office is located on the third floor of the building, and Officer Smart called John Ready, the third floor court security officer to alert him that the two men were coming upstairs. Mr. Ready came downstairs to escort the two men upstairs. Officer Smart gave the Defendant's knife to Mr. Ready who radioed to his supervisor Robert Hoke (a Supervising Deputy U.S. Marshal) for further instructions.

The Court accepts Mr. Hoke's testimony regarding what transpired at the time of taking the Defendant into custody. Mr. Hoke told Mr. Ready to bring the men upstairs and he met them as they got off the elevator on the third floor. Mr. Hoke knows Attorney Baber and observed him to be agitated and under stress. He asked Attorney Baber what was going on but it appeared that Attorney Baber didn't want to talk about it and said only that he had reason to believe that the Defendant had been involved in a capital crime. Mr. Hoke took this report seriously and escorted the Defendant towards his office. Upon reaching the command center area, he decided to lock the Defendant up. He directed another U.S. Marshall, Randolph Ossinger, to place the Defendant in a cell and

2

he went with Attorney Baber into his office. Attorney Baber indicated that his client was turning himself in for a pre-trial release hold.

Attorney Baber explained to him that his client was surrendering to federal authorities because he was involved in a state crime, which he described as a possible homicide, thus violating the terms of the Defendant's probation. When Mr. Ossinger heard the reference to "homicide" he took the Defendant's knife from Mr. Ready and placed in a plastic evidence bag.

Mr. Hoke and Attorney Baber then met with the Defendant's probation officer, Wayne Maddox. Officer Maddox testified that Attorney Baber explained to him that the Defendant was requesting that his authorized release be revoked and for federal authorities to detain him. He testified that Attorney Baber wished to inform them of a homicide over the weekend but provided no further details. Officer Maddox then called the Bangor Police Department (herein, "BPD") to inquire about any recent suspicious deaths and to inform them about the Defendant's surrendering to federal authorities due to a possible homicide. Officer Maddox testified that he gave the BPD the Defendant's home address and telephone number, and that he told them the Defendant was married and his home should be checked because his wife was not answering the phone.

Sergeant Mark Hathaway of the BPD Criminal Investigations Division was assigned as the principal investigator in the Defendant's case. Deputy District Attorney, Mike Roberts, told Sergeant Hathaway to call Attorney Baber about a dead body. Sergeant Hathaway had two conversations with Attorney Baber. In the first conversation, Sergeant Hathaway testified that Attorney Baber told him that the Defendant's wife, Heather Sargent, was dead in their trailer and that she was seven months pregnant. He

3

further stated that his client had surrendered to federal authorities; that he had the keys to the Defendant's trailer and that he wanted to turn them over to the BPD. In the second conversation, Sergeant Hathaway testified that Attorney Baber confirmed that by giving the BPD the keys to the Defendant's trailer that he was giving his consent on behalf of the Defendant for the BPD officers to enter the trailer. Sergeant Hathaway testified that Attorney Baber was concerned that the possible victim (Heather) may be in need of medical attention or that she might be dead.

Following his conversations with Attorney Baber, Seargent Hathaway sent BPD evidence technician, Detective Joel Nadeau to get the Defendant's mobile home keys. After retrieving them, Sergeant Hathaway remained uncertain as to Heather's condition and he instructed Detective Nadeau and three other officers to go to the Defendant's trailer and do a "well-being check" on her. At this time, Sergeant Hathaway also instructed BPD Detective Jeffery Small to go to the federal building and to seize the Defendant's possessions and clothes.[1]

Detective Nadeau went to the Defendant's trailer with three other detectives. Detective Nadeau received no response after knocking and announcing the presence of the BPD. At which point, Detective Nadeau and Detective Paul Edwards used the keys to enter the front door of the trailer. The Detectives went to the bedroom and knocked on the door. After receiving no response, they entered the room and saw a human form that appeared to be kneeling at the foot of the bed. There was a laundry bag over the torso, and it was obvious to the Detectives that the person was dead from multiple stab wounds.

---

[1] Detective Small seized the Defendant's clothing, wallet and backpack. The Detective also seized the Defendant's knife, which had been confiscated from the Defendant by the federal security officers.

The Detectives also observed a number of cats that appeared to have been stabbed to death.

The Detectives exited the trailer and secured the scene. Detective Nadeau drafted an affidavit in support of a search warrant and brought it to the Bangor District Court where he obtained authorization for a search warrant from Judge Jessie Gunther. The terms of the search warrant permitted its execution during the day, specifically from 7 a.m. until 9 p.m. Thereafter, the Detectives executed the search warrant and seized various items of evidence from the trailer.[2]

On January 8, 2003, Detective Larry Ellis went to the Penobscot County Jail where the Defendant was being held on federal probation hold. Detective Ellis had the Defendant remove his shirt and then photographed his torso. Detective Ellis also photographed the Defendant's hands and the top of his head. The Defendant did not object to being photographed.

On January 9, 2003, Detective Nadeau completed a summons and informed the Defendant that he was being charged with the murder of his wife, Heather Sargent.[3] On February 3, 2003, the Defendant was indicted for the Intentional, Knowing, or Depraved Indifference Murder for the death of Heather Sargent in violation of 17-A M.R.S.A. §201(1)(A) & (B). The Defendant filed a Motion to Suppress the evidence obtained during the search of his residence on January 6, 2003, and the evidence obtained during the search of his person.

_____

[2] BPD Detective Larry Ellis conducts investigations and processes crime scenes. He assisted in the search of the Defendant's trailer and the processing of the crime scene. Detective Ellis testified that he seized and processed evidence until 11 p.m. on January 6, 2003.

[3] The Defendant argues that any statements he made to Detective Nadeau at the time of his arrest on January 9, 2003 should be suppressed. The Court need not address this issue since the Defendant merely replied, "okay" when informed of the charges.

## DISCUSSION

### A. The Search of the Defendant's Residence

#### 1. *Consent to Search*

The Defendant challenges the Detective's initial entry into his trailer because the entry was conducted without a warrant. The Defendant also argues that this warrantless entry tainted and invalidated the subsequent search warrant obtained by the Detectives to search his residence. The Law Court has stated:

> It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions. It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent. State v. Kremen, 2000 ME 117, ¶7, 754 A.2d 964 (*quoting* Schneckloth v. Bustamonte, 412 U.S. 218, 219, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973)).

The State, while conceding that the initial entry into the Defendant's residence was a warrantless entry, argues that the Defendant's attorney consented to the entry on the Defendant's behalf and provided the keys for the Detectives to enter the residence. The State further argues that the search was justified by exigent circumstances, and that it was appropriate under the doctrine of inevitable discovery.

The State must establish the existence of such an exception by a preponderance of evidence. Maine v. Fredette, 411 A.2d 65, 68 (Me. 1979) (citations omitted). The Law Court has stated that for consent to be valid, an objective manifestation of consent must have been given by word or gesture "by one bearing an appropriate relationship to the property searched." Id. at 68 (*citing* State v. McLain, 367 A.2d 213, 217 (Me. 1976); *see also* Kreman, 2000 ME 117, ¶10, 754 A.2d at 968. "The consent must be shown to have been free and voluntary and not the product of coercion, whether express or implied."

Fredette, 411 A.2d at 68 (*citing* Bumper v. North Carolina, 391 U.S. 543, 20 L. Ed. 2d 797, 88 S. Ct. 1788 (1968). Voluntariness of"consent" to search must be analyzed under the Fourth Amendment and Article I, section 5, of the Maine Constitution[4], "by examining the totality of the circumstances." Kreman, 2000 ME 117, ¶34, 754 A.2d at 974 (Alexander, J., dissenting) (*citing* Ohio v. Robinette, 519 U.S. 33, 39, 136 L. Ed. 2d 347, 117 S. Ct. 417 (1996)).

The Court finds that the Defendant certainly bore an appropriate relationship to the searched residence, and that he consented voluntarily by word and gesture through his attorney, Brett Baber, to the initial entry of his home by the BPD on January 6, 2003. The Defendant's consent was purely voluntary and not a product of police coercion. The Defendant initiated police presence through his own actions. The Defendant approached his attorney the morning of January 6, 2003 requesting assistance in surrendering to the federal authorities for a possible homicide that occurred involving his wife. The Defendant initiated contact with the police when he proceeded with his attorney that morning to the federal building to surrender himself to federal authorities. It was the Defendant who requested his probation officer, Officer Maddox, to revoke his bail due to his involvement with a possible homicide.

Furthermore, the Defendant turned the keys to his trailer over to his attorney, authorizing his attorney to grant the police consent on his behalf to enter his trailer to search for his wife, Heather. On the morning of January 6, 2003, Sergeant Hathaway

---

[4] Article I, section 5 states:
> Unreasonable searches prohibited Section 5. The people shall be secure in their persons, houses, papers and possessions from all unreasonable searches and seizures; and no warrant to search any place, or seize any person or thing, shall issue without a special designation of the place to be searched, and the person or thing to be seized, nor without probable cause supported by oath or affirmation. Me. Const. Art. 1, §5.

7

contacted Attorney Baber who told him that the Defendant's wife, Heather, may be dead in the trailer and that she was seven months pregnant. Attorney Baber also explained to Sergeant Hathaway that his client had surrendered to federal authorities. Attorney Baber offered that he had the keys to the Defendant's trailer and that he was authorized by his client to turn the keys over to the police for the officers to enter his trailer.

The Defendant argues that Attorney Baber cannot consent a search on his client's behalf. To support this argument, the Defendant cites United States v. Driver, docket number CR-4-77-7 (E.D. Tenn., Jan. 26, 1978), which addressed the issue of whether consent given by one's attorney to search his client's premises without a search warrant is deemed to be the consent of the client.

The right given by the Fourth Amendment of the Constitution[5] is personal and belongs to the Defendant. Stoner v. State of California, 376 U.S. 483, 488-89, 84 S. Ct. 889, 11 L. Ed. 2d 303 (1964). Thus, only the Defendant could waive this right by word or gesture, *either directly or through an agent.* Id. (emphasis added). "'An attorney has express authority to do all those acts which he has been expressly authorized to do by the client; and, in addition, he has, by virtue of the retainer or employment alone, the general implied authority to do on behalf of the client, in or out of court, all acts necessary or incidental to the prosecution or management of the suit, or the accomplishment of the purpose, for which he was retained, and apparent authority to exercise those powers which the client has held him out to third persons as possessing.'" United States v. Driver, docket number CR-4-77-7 (E.D. Tenn., Jan. 26, 1978) (*quoting* 7 C.J.S. 896, Attorney and Client, §79).

---

[5] The Fourth Amendment of the Constitution provides:
> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . . U.S. CONST. Amend. IV

The Court finds that Attorney Baber had actual express authority from his client, the Defendant, to turn the keys to his trailer over to the BPD to enter his trailer to search for his wife. Attorney Baber's actions stemmed from his client's express authority, and not from implied or apparent authority. Accordingly, Attorney Baber's consent given to Sergeant Hathaway to search his client's premises without a search warrant is deemed to be the consent of the occupant of those premises. The Court finds that there is sufficient evidence to conclude that the Defendant voluntarily consented to the search of his home on January 6, 2003.

### 2. Exigent Circumstances

Furthermore, the initial warrantless entry by the BPD into the Defendant's trailer was justified by exigent circumstances, which is a second exception to the warrant requirement. It is well established that "a warrantless entry by criminal law enforcement officials may be legal when there is a compelling need for official action and no time to secure a warrant." State v. Johnson, 413 A.2d 931, 933 (Me., 1980) (quoting Michigan v. Tyler, 436 U.S. 499, 509, 56 L. Ed. 2d 486, 98 S. Ct. 1942 (1978) (citations omitted). The Law Court has stated that any search and seizure conducted pursuant to this exception must be "'limited as to method, place and time to be commensurate with such exigency.'" Johnson, 413 A.2d at 933 (quoting State v. Stone, 294 A.2d 683, 691 (Me., 1972)). However, once law enforcement officers are lawfully on the premises, a seizure of evidence in plain view is not a violation of the Fourth and Fourteenth Amendments. Johnson, 413 A.2d at 933 (citing State v. Mitchell, 390 A.2d 495, 499 (1978).

The Court finds that the knowledge that there was apparently a dead body in the Defendant's trailer created exigent circumstances. There was a compelling need for law

enforcement officers to secure immediate entry to determine whether the Defendant's wife was alive or dead or whether there were other victims in the trailer, and to secure evidence, such as latent fingerprints and bloodstains, which by the passage of time might have become unavailable. *See* Johnson, 413 A.2d at 933. Furthermore, before conducting a more exhausting search of the premises, the BPD Detectives exited the trailer, secured the scene, and obtained a search warrant.[6] Thus, the search and seizure involved here were limited in scope, time and method to the exigencies of the situation. Accordingly, the Court finds that there is sufficient evidence to conclude that the BPD's initial warrantless entry into the Defendant's trailer on January 6, 2003 was also justified by exigent circumstances.

### 3. Inevitable Discovery

A third exception to the warrant requirement is that of "inevitable discovery." Under the doctrine of inevitable discovery, if the State can establish by a preponderance of evidence that the information ultimately would have been discovered by lawful means, then the evidence should be received and the exclusionary rule will not be applied. Nix

---

[6] The Defendant concedes that the initial entry into his trailer may be excusable as a "well-being check;" however, the Defendant argues that the "second entry [] by the Medical Examiner and the police was not warranted." *See* Defendant's Brief, p. 2, ¶1. The Court notes that no evidence was introduced at the testimonial hearing held on December 1, 2003 in connection with the Medical Examiner's entry. However, taking these facts as true, the Court finds that a second warrantless entry into the Defendant's trailer by the Medical Examiner and the police was also legal under the doctrine of exigent circumstances. The Detectives who made the initial entry into the Defendant's trailer, which was lawful, were prohibited by law from moving the body or seizing any evidence on the premises until the Medical Examiner arrived and took over. *See* Johnson, 413 A.2d at 934. The Court finds that the Medical Examiner's entry was a continuation of the Detectives' initial entry and the lack of a warrant did not invalidate the second entry into the Defendant's trailer by the Medical Examiner and the police. *See* Johnson, 413 A.2d at 934 (*citing* Michigan v. Tyler, 436 U.S. at 511). Moreover, any evidence seized by the Medical Examiner or the accompanying police that was in plain view during the lawful entry is not a violation of the Fourth and Fourteenth Amendments.

10

v. Williams, 467 U.S. 431, 444, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984). "The fact making discovery inevitable must arise from circumstances other than those disclosed by the illegal search itself." United States v. Thomas, 955 F.2d 207 (4th Cir. 1992). The dispositive question becomes whether the evidence seized from the search of the Defendant's trailer pursuant to the search warrant should be admitted "'on the ground that it ultimately or inevitably would have been discovered even if no violation of any constitutional . . . provision had taken place.'" State v. Storer, 583 A.2d 1016, 1019 (Me., 1990) (quoting Nix v. Williams, 467 U.S. at 434).

The record here supports the finding that the police ultimately or inevitably would have discovered Heather's body. The Defendant turned himself in to Federal Authorities in connection with a homicide. The Court accepts Officer Smart's testimony that when the Defendant entered the Federal Building, he was in possession of a knife that appeared to have blood on it. The Court accepts BPD Sergeant Hathaway's testimony that Attorney Baber told him that the Defendant's wife was quite possibly dead in the trailer. The Court also accepts Wayne Maddox's (the Defendant's Federal Probation Officer) testimony that he gave Sergeant Hathaway the Defendant's address and told him that his wife was not answering the phone.

The Court finds that all of these factors make it inevitable that eventually the Defendant's trailer would have been entered and his wife's remains discovered.[7] Accordingly, the Court finds that there is sufficient evidence to conclude that the BPD's

---

[7] The State provides as further support for the inevitable discovery of the body, the fact that decomposing flesh gives off a very distinctive foul odor. The Court agrees and finds that inevitably that odor probably would have been detected by a neighbor and reported to the police. See State v. Sugar, 527 A.2d 1377 (N.J. 1987) (concluding discovery of body inevitable because of odor); see also State v. Beede, 406 A.2d 125 (N.H., 1979).

11

initial warrantless entry into the Defendant's trailer on January 6, 2003 was also justified by the doctrine of inevitable discovery.

### 4. *The Scope of the Search Warrant*

The Defendant requests this Court to suppress all evidence seized in the Defendant's trailer pursuant to the search warrant arguing that the State violated the terms of the actual warrant by processing the crime scene at the Defendant's trailer until midnight the next day, when the warrant was marked, "DAYTIME WARRANT ONLY," and explicitly stated that it was to "be executed between the hours of 7:00 AM and 9:00 PM." *See* Defendant's Brief, pp. 2-3, ¶ 2-5. BPD Detective Larry Ellis assisted in the search of the Defendant's trailer and the processing of the crime scene. The Court accepts the testimony of Detective Ellis, who testified that he seized and processed evidence until 11 p.m. on January 6, 2003.

Maine Rule of Criminal Procedure 41 governs Search and Seizure. Rule 41(h) provides:

> (h) **Nighttime Search Warrant.** The warrant shall direct that it be executed between the hours of 7 a.m. and 9 p.m., unless the judge or justice of the peace, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at another time.

First, the Court finds that on the facts presented by Sergeant Hathaway in his affidavit, District Court Judge Gunther, who issued the search warrant, would have been justified in finding "reasonable cause" for a nighttime search of the Defendant's residence had Sergeant Hathaway requested a nighttime search. Furthermore, it is reasonable to take into account the minimal nature of the intrusion into the Defendant's privacy posed by the nighttime search. As the Defendant was not at home, he would not be subject to the frightening prospect of being awakened by the police in the middle of

the night. The serious safety concerns of the well being of the Defendant's wife far outweigh the concern for intrusion upon privacy involved in this nighttime search. *See* United States v. Pryor, 652 F. Supp. 1353, 1362-64 (D. Me. 1987) (concluding a nighttime search was supported by reasonable cause and thus did not violate Federal Rule of Criminal Procedure 41(c), which places similar restrictions on nighttime searches).

Second, even if this Court were to find that the nighttime search was conducted in violation of M. R. Crim. P. 41(h), suppression is not necessarily the appropriate remedy. *See* United States v. Pryor, 652 F. Supp. at 1364 (relying on precedent set by the Sixth Circuit). In United States v. Searp, 586 F.2d 1117 (6th Cir. 1978), the Sixth Circuit considered whether to suppress evidence obtained in an unauthorized nighttime search in violation of FED. R. CRIM. P. 41. The Sixth Circuit applied the following standard upon finding that FED. R. CRIM. P. 41 had been violated:

> The particular procedures mandated before a nighttime search may be conducted are not part of the fourth amendment, and we conclude that suppression should not automatically result from any violation of the rules. *A further inquiry into the actual search which occurred is permissible.* The Court should be guided by the principle underlying Rule 52(a), FED. R. CRIM. P., which provides: 'Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.'

> When there has merely been a violation of the procedural rules governing night searches, suppression, with its attendant potential for a miscarriage of justice, is not justified when there was neither a possibility of bad faith conduct on the part of the police, nor prejudice to the defendant (in the sense that the search might not have occurred or would not have been so abusive if the requirements of the Rule had been observed).

United States v. Searp, 586 F. Supp at 1124-25 (emphasis added); *see also* United States v. Ravich, 421 F. Supp. 1196, 1200-02 (2d Cir. 1970) (relying on FED. R. CRIM. P. 52(a) in upholding a nighttime search that violated FED. R. CRIM. P. 41); United States v.

Pryor, 652 F. Supp. at 1364-66 (holding that even if evidence was obtained in violation of FED. R. CRIM. P. 41, suppression is not required unless prejudice is shown or the search was "unreasonable in the constitutional sense.").

Assuming that the instant search was in violation of M. R. Crim. P. 41(h) because the Detectives did not finish processing evidence at the crime scene until 11 p.m., rather then 9 p.m. as directed by the search warrant, in considering the circumstances of this particular search, the Court concludes that suppression is not appropriate. First, the search began in the daytime hours as authorized by the search warrant, and ended so soon after 9 p.m. to make the infraction *de minimis*. Second, as discussed supra, there was a reasonable basis for a nighttime search if Sergeant Hathaway had sought one. Third, there is no evidence of an intentional or deliberate disregard of the requirements of M. R. Crim. P. 41(h) by the BPD. Fourth, and most significant, there was no prejudice to the Defendant resulting from any violation of the procedural requirements of Rule 41, since the Defendant was in federal custody and not at his residence at the time of the search, and thus was not subject to an "abrasive" or "frightening" nighttime search. Accordingly, evidence obtained in the nighttime search conducted contrary to M. R. Crim. P. 41(h) and the terms of the search warrant will not be suppressed.

**B. The Seizure of the Defendant's Clothes and Knife.**

The Defendant further argues that the seizure of his knife when he entered the federal building and his backpack and clothes while in federal custody by BPD Detective Small was in violation of his rights under the Fourth Amendment of the United States Constitution and Article 1, Section 5 of the Maine Constitution. The Defendant contends

14

that Detective Small's warrantless search and seizure was unreasonable; therefore, his knife, backpack, and clothes should be suppressed.

"The prevailing rule under the Fourth Amendment that searches and seizures may not be made without a warrant is subject to various exceptions." United States v. Edwards, 415 U.S. 800, 802, 39 L. Ed. 2d 771, 94 S. Ct. 1234 (1974). One of the well-established exceptions permits warrantless searches incident to custodial arrests.[8] United States v. Edwards, 415 U.S. at 802 (citations omitted); *see also* State v. DuBay, 313 A.2d 908, 909-12 (Me. 1974) (holding that a stationhouse search of the defendant's person as a search incident to lawful custodial arrest does not violate the Fourth Amendment). This exception is justified by "the reasonableness of searching for weapons, instruments of escape, and evidence of a crime when a person is taken into official custody and lawfully detained." United States v. Robinson, 414 U.S. 218, 235, 38 L. Ed. 2d. 427, 94 S. Ct. 467 (1973). Clothing or other belongings of the accused may be seized upon arrival of the accused at the place of detention or thereafter, and later subjected to evidentiary tests and laboratory analysis. United States v. Edwards, 415 U.S. at 802-05 (upholding warrantless search and seizure of the accused's clothing ten hours after his arrest).

At the time BPD Detective Small went to the Federal Building in Bangor on the morning of January 6, 2003, the Defendant was already in custody in a holding cell and being held on a federal probation hold for his possible involvement in a homicide. The Court finds that the normal processes incident to arrest and custody had not been completed when the Defendant was placed in the cell by the federal authorities earlier that morning. Thus, Detective Small was not only entitled to take the Defendant's

---

[8] "[I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but it is also a 'reasonable' search under that Amendment." United States v. Robinson, 414 U.S. 218, 235, 38 L. Ed. 2d 427, 94 S. Ct. 467 (1973).

15

clothing into official custody, but to also take any possible evidence of the crime (his backpack and knife) that was in the Defendant's immediate possession. At that time, the police had probable cause to believe the Defendant's knife, backpack, and clothing were material evidence of a possible homicide for which he requested that his federal probation be revoked and that he be taken into custody.

The Defendant argues that the police seizure of his knife, backpack, and clothes while in federal probation hold was improper because he had not yet been arrested on State charges. If the Court understands the Defendant's argument correctly, he is arguing that because the police had no knowledge of the alleged crime (in that Heather's body had not yet been discovered) when his knife, backpack, and clothing were seized, no probable cause existed for their seizure.

The Defendant's position cannot be sustained. At the time of the seizure the Defendant was under lawful arrest and police custody.[9] Whether the seizure can be characterized as a pre-incarceration seizure[10] or one made in conjunction with a lawful arrest is unimportant, since in neither event does the seizure violate any State or federal constitutional provisions. State v. McCarthy, 355 A.2d 923, 926 (Me. 1976) (citations omitted).

Furthermore, the Law Court has held that "fingerprinting a person in lawful custody for purposes of latent comparison is not constitutionally proscribed." McCarthy,

---

[9] The Defendant requested his probation officer, Officer Maddox, to revoke his probation due to his involvement with a possible homicide. The Defendant provided the federal authorities with enough information to have his probation revoked. The Defendant was in custody pursuant to a federal probation hold.

[10] The warrantless search and seizure of the Defendant's knife, backpack, and clothing can also be justified as a pre-incarceration search of a person who has validly been arrested, which is recognized as an exception to the warrant requirement. State v. Dubay, 338 A.2d 797, 798 (Me. 1975) (holding that a pre-incarceration search does not offend Article I, §5 of the Maine Constitution).

355 A.2d at 926 (*citing* State v. Inman, 301 A.2d 348 (Me. 1973)). There is no rational distinction between fingerprinting a lawfully arrested person and taking a knife, backpack, and clothing from such a person, all acts being for purposes of latent comparison. McCarthy, 355 A.2d at 926. The fact that BPD Detective Small was unaware of the criminal violation when the items were seized is not controlling. Id. at 926 (reasoning "[p]olice action is not subject to rigid logistic standards but is allowed that degree of flexibility necessary to meet the reactions of suspects subject to police detention."). Accordingly, Detective Small's seizure of the Defendant's knife, backpack, and clothes did not violate any State or Federal constitutional provisions and will not be suppressed.

## C. The Photographs.

The Defendant also moves to suppress the photographs taken of his physical condition by Detective Ellis at the Penobscot County Jail where he was being held on federal probation hold on January 8, 2003. The Defendant argues that these photographs violated his rights under the Fourth Amendment of the United States Constitution and Article I, Section 5 of the Maine Constitution.

The Court finds that the photographs of the Defendant's physical condition were permitted by statute and did not violate his constitutional rights. 25 M.R.S.A. §1542-A (1)(A) requires a law enforcement agency investigating a crime found in Title 17-A to take the person's fingerprints. The statute also permits photographs to be taken of the person when fingerprints are taken pursuant to 25 M.R.S.A. §1542-A (1)(A). *See* 25 M.R.S.A. §1542-A (2). Furthermore, photographing a person in lawful custody for

purposes of latent comparison is not constitutionally proscribed. *See* <u>McCarthy</u>, 355 A.2d at 926 (*citing* <u>State v. Inman</u>, 301 A.2d 348 (Me. 1973)).

Alternatively, the Court finds that the Defendant did not object either by word or gesture, and thus, voluntarily consented to Detective Ellis taking photographs of his physical condition. 25 M.R.S.A. §1542-A (5)(D) permits a law enforcement officer to take the fingerprints of any person who voluntarily submits to fingerprinting. Additionally, 25 M.R.S.A. §1542-A (6) permits a law enforcement officer to take palm prints, footprints, and photographs when a person voluntarily submits to them.

## Conclusion

The **ORDER** shall be: The Defendant's Motion to Suppress is **DENIED** as to the evidence obtained during the search of his residence on January 6, 2003, and the evidence obtained during the search of his person.

Dated: <u>February 12, 2004</u>

E. Allen Hunter
Justice, Superior Court

18

DEFENSE COUNSEL

CHRISTOPHER LARGAY, ESQ. AND JOSEPH PICKERING, ESQ.
293 STATE STREET
BANGOR ME   04401

PHONE   947-4529


STATE

ANDREW BENSON ASST AG
OFFICE OF THE ATTORNEY GENERAL
6 STATE HOUSE STATION
AUGUSTA   ME   04333